## EASTERN ENTERPRISES *v.* APFEL, COMMISSIONER OF SOCIAL SECURITY, ET AL.

No. 97–42.   Argued March 4, 1998—Decided June 25, 1998

JUSTICE O'CONNOR, joined by THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS, concluded:

1. The declaratory judgment and injunction petitioner seeks are an appropriate remedy for the taking alleged in this case, and it is within the district courts' power to award such equitable relief. The Tucker Act may require that a just compensation claim under the Takings Clause be filed in the Court of Federal Claims, but petitioner does not seek compensation from the Government. In situations analogous to the one here, this Court has assumed the lack of a compensatory remedy and has granted equitable relief for Takings Clause violations without discussing the Tucker Act's applicability. See, *e. g.*, *Babbitt* v. *Youpee*, 519 U. S. 234, 234–235. Pp. 519–522.

500

2. The Coal Act's allocation of liability to Eastern violates the Takings Clause. Pp. 522–537.

(a) Economic regulation such as the Coal Act may effect a taking. *United States* v. *Security Industrial Bank*, 459 U. S. 70, 78. The party challenging the government action bears a substantial burden, for not every destruction or injury to property by such action is a constitutional taking. A regulation's constitutionality is evaluated by examining the governmental action's "justice and fairness." See *Andrus* v. *Allard*, 444 U. S. 51, 65. Although that inquiry does not lend itself to any set formula, three factors traditionally have informed this Court's regulatory takings analysis: "[T]he economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action." *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175. Pp. 522–524.

(b) The analysis in this case is informed by previous decisions considering the constitutionality of somewhat similar legislative schemes: *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1 (Black Lung Benefits Act of 1972); *Connolly* v. *Pension Benefit Guaranty Corporation*, 475 U. S. 211 (Multiemployer Pension Plan Amendments Act of 1980); and *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602 (same). Those opinions make clear that Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties; and that it may impose retroactive liability to some degree, particularly where it is " 'confined to short and limited periods required by the practicalities of producing national legislation,' " *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 731. The decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and if the extent of that liability is substantially disproportionate to the parties' experience. Pp. 524–529.

(c) The Coal Act's allocation scheme, as applied to Eastern, presents such a case, when the three traditional factors are considered. As to the economic impact, Eastern's Coal Act liability is substantial, and the company is clearly deprived of the $50 to $100 million it must pay to the Combined Fund. An employer's statutory liability for multiemployer plan benefits should reflect some proportionality to its experience with the plan. *Concrete Pipe, supra,* at 645. Eastern contributed to the 1947 and 1950 W&R Funds, but ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans established under the 1974, 1978, or subsequent NBCWA's. It is the latter agreements, however, that first suggest an industry commitment to funding lifetime health

benefits for retirees and their dependents. During the years that Eastern employed miners, such benefits were far less extensive than under the 1974 NBCWA, were unvested, and were fully subject to alteration or termination. To the extent that Eastern may be able to seek indemnification from EACC or Peabody under contractual arrangements that might insure Eastern against liabilities arising out of its former coal operations, that indemnity is neither enhanced nor supplanted by the Coal Act and does not affect the availability of the declaratory relief sought here. Respondents' argument that the Coal Act moderates and mitigates the economic impact by allocating some of Eastern's former employees to signatories of the 1978 NBCWA is unavailing. That Eastern is not forced to bear the burden of lifetime benefits for all of its former employees does not mean that its liability is not a significant economic burden.

For similar reasons, the Coal Act substantially interferes with Eastern's reasonable investment-backed expectations. It operates retroactively, reaching back 30 to 50 years to impose liability based on Eastern's activities between 1946 and 1965. Retroactive legislation is generally disfavored. It presents problems of unfairness because it can deprive citizens of legitimate expectations and upset settled transactions. *General Motors Corp.* v. *Romein*, 503 U. S. 181, 191. The distance into the past that the Coal Act reaches back to impose liability on Eastern and the magnitude of that liability raise substantial fairness questions. The pre-1974 NBCWA's do not demonstrate that there was an implicit industrywide agreement to fund lifetime health benefits at the time that Eastern was involved in the coal industry. The 1947 and 1950 W&R Funds, in which Eastern participated, operated on a pay-as-you-go basis and the classes of beneficiaries were subject to the trustees' discretion. Not until 1974, when ERISA forced revisions to the 1950 W&R Fund and when Eastern was no longer in the industry, could lifetime medical benefits have been viewed as promised. Thus, the Coal Act's scheme for allocating Combined Fund premiums is not calibrated either to Eastern's past actions or to any agreement by the company. Nor would the Federal Government's pattern of involvement in the coal industry have given Eastern sufficient notice that lifetime health benefits might be guaranteed to retirees several decades later. Eastern's liability for such benefits also differs from coal operators' responsibility under the Black Lung Benefits Act of 1972, which spread the cost of employment-related disabilities to those who profited from the fruits of the employees' labor, *Turner Elkhorn, supra,* at 18. Finally, the nature of the governmental action in this case is quite unusual in that Congress' solution to the grave funding problem that it identified singles out certain employers to bear a substantial burden, based on the employers' conduct

far in the past, and unrelated to any commitment that the employers made or to any injury they caused. Pp. 529–537.

JUSTICE KENNEDY concluded that application of the Coal Act to Eastern would violate the proper bounds of settled due process principles. Although the Court has been hesitant to subject economic legislation to due process scrutiny as a general matter, this country's law has harbored a singular distrust of retroactive statutes, and that distrust is reflected in this Court's due process jurisprudence. For example, in *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15, the Court held that due process requires an inquiry into whether a legislature acted in an arbitrary and irrational way when enacting a retroactive law. This formulation has been repeated in numerous recent cases, *e. g.*, *United States* v. *Carlton*, 512 U. S. 26, 31, which reflect the recognition that retroactive lawmaking is a particular concern because of the legislative temptation to use it as a means of retribution against unpopular groups or individuals, *Landgraf* v. *USI Film Products*, 511 U. S. 244, 266. Because change in the legal consequences of transactions long closed can destroy the reasonable certainty and security which are the very objects of property ownership, due process protection for property must be understood to incorporate the settled tradition against retroactive laws of great severity. The instant case presents one of those rare instances where the legislature has exceeded the limits imposed by due process. The Coal Act's remedy bears no legitimate relation to the interest which the Government asserts supports the statute. The degree of retroactive effect, which is a significant determinant in a statute's constitutionality, *e. g.*, *United States* v. *Carlton, supra,* at 32, is of unprecedented scope here, since the Coal Act created liability for events occurring 35 years ago. While the Court has upheld the imposition of liability on former employers based on past employment relationships when the remedial statutes were designed to impose an actual, measurable business cost which the employer had been able to avoid in the past, *e. g.*, *Turner Elkhorn, supra,* at 19, the Coal Act does not serve this purpose. The beneficiaries' expectation of lifetime benefits was created by promises and agreements made long after Eastern left the coal business, and Eastern was not responsible for the perilous condition of the 1950 and 1974 Plans which jeopardized the benefits. Pp. 547–550.

O'CONNOR, J., announced the judgment of the Court and delivered an opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined. THOMAS, J., filed a concurring opinion, *post*, p. 538. KENNEDY, J., filed an opinion concurring in the judgment and dissenting in part, *post*, p. 539. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 550. BREYER, J., filed a dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ., joined, *post*, p. 553.

*John T. Montgomery* argued the cause for petitioner. With him on the briefs were *John H. Mason* and *L. William Law.*

*Deputy Solicitor General Kneedler* argued the cause for the federal respondent. With him on the brief were *Solicitor General Waxman, Assistant Attorney General Hunger, Paul R. Q. Wolfson, Douglas N. Letter,* and *Sushma Soni.*

*Peter Buscemi* argued the cause for respondents UMWA Combined Benefit Fund et al. With him on the brief were *Stanley F. Lechner, David Lubitz, John R. Mooney, Paul A. Green,* and *David W. Allen. Kenneth A. Sweder* filed a brief for respondents Peabody Holding Co., Inc., et al.*

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join.

In this case, the Court considers a challenge under the Due Process and Takings Clauses of the Constitution to the Coal

---

*Briefs of *amici curiae* urging reversal were filed for AlliedSignal Inc. et al. by *Donald B. Ayer, Jonathan C. Rose, James E. Gauch,* and *Gregory G. Katsas;* for Davon, Inc., by *John W. Fischer II;* for Pardee & Curtin Lumber Co. et al. by *Arthur Newbold, Ethan D. Fogel,* and *Andrew S. Miller;* for Unity Real Estate Co. et al. by *Robert H. Bork, David J. Laurent, Patrick M. McSweeney, William B. Ellis,* and *John L. Marshall;* and for the Washington Legal Foundation by *Timothy S. Bishop, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the Bituminous Coal Operators' Association, Inc., by *Clifford M. Sloan* and *Paul L. Joffe;* for California Cities and Counties et al. by *John R. Calhoun, John D. Echeverria, James K. Hahn, Anthony Saul Alperin, Samuel L. Jackson, Joan R. Gallo, George Rios, Louise H. Renne, Gary T. Ragghianti,* and *S. Shane Stark;* for Cedar Coal Co. et al. by *David M. Cohen;* for Freeman United Coal Mining Co. by *Kathryn S. Matkov;* for Ohio Valley Coal Co. et al. by *John G. Roberts, Jr.;* and for the United Mine Workers of America by *Grant Crandall.*

Briefs of *amici curiae* were filed for Midwest Motor Express, Inc., by *Hervey H. Aitken, Jr.,* and *Roy A. Sheetz;* and for Pittston Co. by *A. E. Dick Howard, Stephen M. Hodges, Wade W. Massie,* and *Gregory B. Robertson.*

Industry Retiree Health Benefit Act of 1992 (Coal Act or Act), 26 U. S. C. §§ 9701–9722 (1994 ed. and Supp. II), which establishes a mechanism for funding health care benefits for retirees from the coal industry and their dependents. We conclude that the Coal Act, as applied to petitioner Eastern Enterprises, effects an unconstitutional taking.

I

A

For a good part of this century, employers in the coal industry have been involved in negotiations with the United Mine Workers of America (UMWA or Union) regarding the provision of employee benefits to coal miners. When petitioner Eastern Enterprises (Eastern) was formed in 1929, coal operators provided health care to their employees through a prepayment system funded by payroll deductions. Because of the rural location of most mines, medical facilities were frequently substandard, and many of the medical professionals willing to work in mining areas were "company doctors," often selected by the coal operators for reasons other than their skills or training. The health care available to coal miners and their families was deficient in many respects. In addition, the cost of company-provided services, such as housing and medical care, often consumed the bulk of miners' compensation. See generally U. S. Dept. of Interior, Report of the Coal Mines Administration, A Medical Survey of the Bituminous-Coal Industry (1947) (Boone Report); Report of United States Coal Commission, S. Doc. No. 195, 68th Cong., 2d Sess. (1925).

In the late 1930's, the UMWA began to demand changes in the manner in which essential services were provided to miners, and by 1946, the subject of miners' health care had become a critical issue in collective bargaining negotiations between the Union and bituminous coal companies. When a breakdown in those negotiations resulted in a nationwide

strike, President Truman issued an Executive order directing Secretary of the Interior Julius Krug to take possession of all bituminous coal mines and to negotiate "appropriate changes in the terms and conditions of employment" of miners with the UMWA. 11 Fed. Reg. 5593 (1946). A week of negotiations between Secretary Krug and UMWA President John L. Lewis produced the historic Krug-Lewis Agreement that ended the strike. See App. in No. 96–1947 (CA1), p. 610 (hereinafter App. (CA1)).

That agreement, described as "an almost complete victory for the miners," M. Fox, United We Stand 405 (1990), led to the creation of benefit funds, financed by royalties on coal produced and payroll deductions. The funds compensated miners and their dependents and survivors for wages lost due to disability, death, or retirement. The funds also provided for the medical expenses of miners and their dependents, with the precise benefits determined by UMWA-appointed trustees. In addition, the Krug-Lewis Agreement committed the Government to undertake a comprehensive survey of the living conditions in coal mining areas in order to assess the improvements necessary to bring those communities up to "recognized American standards." Krug-Lewis Agreement §5, App. (CA1) 613. That study concluded that the medical needs of miners and their dependents would be more effectively served through "a broad prepayment system, based on sound actuarial principles." Boone Report 226–227.

Shortly after the study was issued, the mines returned to private control and the UMWA and several coal operators entered into the National Bituminous Coal Wage Agreement of 1947 (1947 NBCWA), App. (CA1) 615, which established the United Mine Workers of America Welfare and Retirement Fund (1947 W&R Fund), modeled after the Krug-Lewis benefit trusts. The Fund was to use the proceeds of a royalty on coal production to provide pension and medical

benefits to miners and their families. The 1947 NBCWA did not specify the benefits to which miners and their dependents were entitled. Instead, three trustees appointed by the parties were given authority to determine "coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions for benefits, investment of trust funds, and all other related matters." 1947 NBCWA 146, App. (CA1) 619.

Disagreement over benefits continued, however, leading to the execution of another NBCWA in 1950, which created a new multiemployer trust, the United Mine Workers of America Welfare and Retirement Fund of 1950 (1950 W&R Fund). The 1950 W&R Fund established a 30-cents-per-ton royalty on coal produced, payable by signatory operators on a "several and not joint" basis for the duration of the 1950 Agreement. 1950 NBCWA 63, App. (CA1) 640. As with the 1947 W&R Fund, the 1950 W&R Fund was governed by three trustees chosen by the parties and vested with responsibility to determine the level of benefits. *Id.*, at 59–61, App. (CA1) 638–639. Between 1950 and 1974, the 1950 NBCWA was amended on occasion, and new NBCWA's were adopted in 1968 and 1971. Except for increases in the amount of royalty payments, however, the terms and structure of the 1950 W&R Fund remained essentially unchanged. A 1951 amendment recognized the creation of the Bituminous Coal Operators' Association (BCOA), a multiemployer bargaining association, which became the primary representative of coal operators in negotiations with the Union. See App. (CA1) 647–648.

Under the 1950 W&R Fund, miners and their dependents were not promised specific benefits. As the 1950 W&R Fund's Annual Report for the fiscal year ending June 30, 1955, explained:

"Under the legal and financial obligations . . . imposed [by the Trust Agreement], the Fund is operated on a pay-as-you-go basis, maintaining a sound relation-

ship between revenues and expenditures. Resolutions adopted by the Trustees governing Fund Benefits—Pensions, Hospital and Medical Care, and Widows and Survivors Benefits—specifically provide that all these Benefits are subject to termination, revision, or amendment, by the Trustees in their discretion at any time. No vested interest in the Fund extends to any beneficiary." *Id.*, at 3–4, App. (CA1) 869–870.

See also *Mine Workers Health and Retirement Funds* v. *Robinson*, 455 U. S. 562, 565, and n. 2 (1982). Thus, the Fund operated using a fixed amount of royalties, with the trustees having the authority to establish and adjust the level of benefits provided so as to remain within the budgetary constraints.

Subsequent annual reports of the 1950 W&R Fund reiterated that benefits were subject to change. See, *e. g.*, 1950 W&R Fund Annual Report for the Year Ending June 30, 1956 (1956 Annual Report), p. 30, App. (CA1) 929 ("Resolutions adopted by the Trustees governing Fund Benefits—Pensions, Hospital and Medical Care, and Widows and Survivors Benefits—specifically provide that all these Benefits are subject to termination, revision, or amendment, by the Trustees in their discretion at any time"); 1950 W&R Fund Annual Report for the Year Ending June 30, 1958, pp. 20–21, App. (CA1) 955–956 ("Trustee regulations governing Benefits specifically provide that all Benefits which have been authorized are subject to termination, suspension, revision, or amendment by the Trustees in their discretion at any time. Each beneficiary is officially notified of this governing provision at the time his Benefit is authorized").[1]  Thus, although

---

[1] See also 1950 W&R Fund Annual Report for the Year Ending June 30, 1959, pp. 27–28, App. (CA1) 995–996; 1950 W&R Fund Annual Report for the Year Ending June 30, 1960 (1960 Annual Report), pp. 19–20, App. (CA1) 1028–1029; 1950 W&R Fund Annual Report for the Year Ending June 30, 1961 (1961 Annual Report), p. 5, App. (CA1) 1047; 1950 W&R Fund Annual Report for the Year Ending June 30, 1962, p. 5, App. (CA1)

persons involved in the coal industry may have made occasional statements intimating that the 1950 W&R Fund promised lifetime health benefits, see App. (CA1) 1899, 1971–1972, it is clear that the 1950 W&R Fund did not, by its terms, guarantee lifetime health benefits for retirees and their dependents. In fact, as to widows of miners, the 1950 W&R Fund expressly limited health benefits to the time period during which widows would also receive death benefits. See, *e. g., Robinson, supra,* at 565–566; 1956 Annual Report 14, App. (CA1) 913.

Between 1950 and 1974, the trustees often exercised their prerogative to alter the level of benefits according to the Fund's budget. In 1960, for instance, "[t]he Trustees of the Fund, recognizing their legal and fiscal obligation to soundly administer the Trust Fund, took action prior to the close of the fiscal year, to curtail the excess of expenditures over income," by "limit[ing] or terminat[ing] eligibility for [certain] Trust Fund Benefits." 1960 Annual Report 2, App. (CA1) 1011. Similar concerns prompted the trustees to reduce monthly pension benefits by 25% at one point, and to limit the range of medical and pension benefits available to miners employed by operators who did not pay the required royalties. See 1961 Annual Report 2, 11–12, App. (CA1) 1044, 1053–1054; 1963 Annual Report 13, 16, App. (CA1) 1121, 1124.

Reductions in benefits were not always acceptable to the miners, and some wildcat strikes erupted in the 1960's. See Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report 22–23 (1990) (Coal Comm'n Report), App. (CA1)

---

1080; 1950 W&R Fund Annual Report for the Year Ending June 30, 1963 (1963 Annual Report), p. 5, App. (CA1) 1113; 1950 W&R Fund Annual Report for the Year Ending June 30, 1964, p. 8, App. (CA1) 1146; 1950 W&R Fund Annual Report for the Year Ending June 30, 1965, p. 18, App. (CA1) 1191; 1950 W&R Fund Annual Report for the Year Ending June 30, 1966 (1966 Annual Report), p. 19, App. (CA1) 1223.

1352–1353. Nonetheless, the 1950 W&R Fund continued to provide benefits on a "pay-as-you-go" basis, with the level of benefits fully subject to revision, until the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.*, introduced specific funding and vesting requirements for pension plans. To comply with ERISA, the UMWA and the BCOA entered into a new agreement, the 1974 NBCWA, which created four trusts, funded by royalties on coal production and premiums based on hours worked by miners, to replace the 1950 W&R Fund. See *Robinson, supra,* at 566. Two of the new trusts, the UMWA 1950 Benefit Plan and Trust (1950 Benefit Plan) and the UMWA 1974 Benefit Plan and Trust (1974 Benefit Plan), provided nonpension benefits, including medical benefits. Miners who retired before January 1, 1976, and their dependents were covered by the 1950 Benefit Plan, while active miners and those who retired after 1975 were covered by the 1974 Benefit Plan.

The 1974 NBCWA thus was the first agreement between the UMWA and the BCOA to expressly reference health benefits for retirees; prior agreements did not specifically mention retirees, and the scope of their benefits was left to the discretion of fund trustees. The 1974 NBCWA explained that it was amending previous medical benefits to provide a Health Services card for retired miners until their death, and to their widows until their death or remarriage. 1974 NBCWA 99, 105 (Summary of Principal Provisions, UMWA Health and Retirement Benefits), App. (CA1) 755, 758. Despite the expanded benefits, the 1974 NBCWA did not alter the employers' obligation to contribute only a fixed amount of royalties, nor did it extend employers' liability beyond the life of the agreement. See *id.,* Art. XX, § (d), App. (CA1) 749.

As a result of the broadened coverage under the 1974 NBCWA, the number of eligible benefit recipients jumped dramatically. See 1977 Annual Report of the UMWA Wel-

510

fare and Retirement Funds 3, App. (CA1) 1253. A 1993 Report of the House Committee on Ways and Means explained:

> "The 1974 agreement was the first NBCWA to mention retiree health benefits. As part of a substantial liberalization of benefits and eligibility under both the pension and health plans, the 1974 contract provided lifetime health benefits for retirees, disabled mine workers, and spouses, and extended the benefits to surviving spouses . . . ." House Committee on Ways and Means, Financing UMWA Coal Miner "Orphan Retiree" Health Benefits, 103d Cong., 1st Sess., 4 (Comm. Print 1993) (House Report).

The increase in benefits, combined with various other circumstances—such as a decline in the amount of coal produced, the retirement of a generation of miners, and rapid escalation of health care costs—quickly resulted in financial problems for the 1950 and 1974 Benefit Plans. In response, the next NBCWA, executed in 1978, assigned responsibility to signatory employers for the health care of their own active and retired employees. See 1978 NBCWA, Art. XX, § (c)(3), App. (CA1) 778. The 1974 Benefit Plan remained in effect, but only to cover retirees whose former employers were no longer in business.

To ensure the Benefit Plans' solvency, the 1978 NBCWA included a "guarantee" clause obligating signatories to make sufficient contributions to maintain benefits during that agreement, and "evergreen" clauses were incorporated into the Benefit Plans so that signatories would be required to contribute as long as they remained in the coal business, regardless of whether they signed a subsequent agreement. See id., § (h), App. (CA1) 787–788; House Report 5. As a result, the coal operators' liability to the Benefit Plans shifted from a defined contribution obligation, under which employers were responsible only for a predetermined

amount of royalties, to a form of defined benefit obligation, under which employers were to fund specific benefits.

Despite the 1978 changes, the Benefit Plans continued to suffer financially as costs increased and employers who had signed the 1978 NBCWA withdrew from the agreement, either to continue in business with nonunion employees or to exit the coal business altogether. As more and more coal operators abandoned the Benefit Plans, the remaining signatories were forced to absorb the increasing cost of covering retirees left behind by exiting employers. A spiral soon developed, with the rising cost of participation leading more employers to withdraw from the Benefit Plans, resulting in more onerous obligations for those that remained. In 1988, the UMWA and BCOA attempted to relieve the situation by imposing withdrawal liability on NBCWA signatories who seceded from the Benefit Plans. See 1988 NBCWA, Art. XX, §§ (i) and (j), App. (CA1) 805, 828–829. Even so, by 1990, the 1950 and 1974 Benefit Plans had incurred a deficit of about $110 million, and obligations to beneficiaries were continuing to surpass revenues. See House Report 9; Coal Comm'n Report 43–44, App. (CA1) 1373–1374.

## B

In response to unrest among miners, such as the lengthy strike that followed Pittston Coal Company's refusal to sign the 1988 NBCWA, Secretary of Labor Elizabeth Dole announced the creation of the Advisory Commission on United Mine Workers of America Retiree Health Benefits (Coal Commission or Commission). The Coal Commission was charged with "recommend[ing] a solution for ensuring that orphan retirees in the 1950 and 1974 Benefit Trusts will continue to receive promised medical care." Coal Comm'n Report 2, App. (CA1) 1333. The Commission explained that "[h]ealth care benefits are an emotional subject in the coal industry, not only because coal miners have been promised

and guaranteed health care benefits for life, but also because coal miners in their labor contracts have traded lower pensions over the years for better health care benefits." Coal Comm'n Report, Executive Summary vii, App. (CA1) 1324. The Commission agreed that "a statutory obligation to contribute to the plans should be imposed on current and former signatories to the [NBCWA]," but disagreed about "whether the entire [coal] industry should contribute to the resolution of the problem of orphan retirees." *Id.*, at vii–viii, App. (CA1) 1324–1325. Therefore, the Commission proposed two alternative funding plans for Congress' consideration.

First, the Commission recommended that Congress establish a fund financed by an industrywide fee to provide health care to orphan retirees at the level of benefits they were entitled to receive at that fund's inception. To cover the cost of medical benefits for retirees from signatories to the 1978 or subsequent NBCWA's who remained in the coal business, the Commission proposed the creation of another fund financed by the retirees' most recent employers. *Id.*, at 61, App. (CA1) 1390. The Commission also recommended that Congress codify the "evergreen" obligation of the 1978 and subsequent NBCWA's. *Id.*, at 63, App. (CA1) 1392.

As an alternative to imposing industrywide liability, the Commission suggested that Congress spread the cost of retirees' health benefits across "a broadened base of current and past signatories to the contracts," apparently referring to the 1978 and subsequent NBCWA's. See *id.*, at 58, 65, App. (CA1) 1387, 1394. Not all Commission members agreed, however, that it would be fair to assign such a burden to signatories of the 1978 agreement. Four Commissioners explained that "[i]ssues of elemental fairness are involved" in imposing obligations on "respectable operators who made decisions in the past to move to different locales, invest in different technology, or pursue their business with or without respect to union presence." *Id.*, at 85, App. (CA1) 1414 (statement of Commissioners Michael J. Mahoney,

Carl J. Schramm, Arlene Holen, Richard M. Holsten); see also
*id.*, at 81–82, App. (CA1) 1410–1411 (statement of Commissioner Richard M. Holsten).

After the Coal Commission issued its report, Congress considered several proposals to fund health benefits for UMWA retirees. At a 1991 hearing, a Senate subcommittee was advised that more than 120,000 retirees might not receive "the benefits they were promised." Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing before the Subcommittee on Medicare and Long-Term Care of the Senate Committee on Finance, 102d Cong., 1st Sess., 45 (1991) (statement of BCOA Chairman Michael K. Reilly). The Coal Commission's Chairman submitted a statement urging that Congress' assistance was needed "to fulfill the promises that began in the collective bargaining process nearly 50 years ago . . . ." *Id.*, at 306 (prepared statement of W. J. Usery, Jr.). Some Senators expressed similar concerns that retired miners might not receive the benefits promised to them. See *id.*, at 16 (statement of Sen. Dave Durenberger) (describing issue as involving "a whole bunch of promises made to a whole lot of people back in the 1940s and 1950s when the cost consequences of those problems were totally unknown"); *id.*, at 59 (prepared statement of Sen. Orrin G. Hatch) (stating that "miners and their families . . . were led to believe by their own union leaders and the companies for which they worked that they were guaranteed lifetime [health] benefits").

In 1992, as part of a larger bill, both Houses passed legislation based on the Coal Commission's first proposal, which required signatories to the 1978 or any subsequent NBCWA to fund their own retirees' health care costs and provided for orphan retirees' benefits through a tax on future coal production. See H. R. Conf. Rep. No. 102–461, pp. 268–295 (1992). President Bush, however, vetoed the entire bill. See H. R. Doc. No. 102–206, p. 1 (1992).

Congress responded by passing the Coal Act, a modified version of the Coal Commission's alternative funding plan. In the Act, Congress purported "to identify persons most responsible for [1950 and 1974 Benefit Plan] liabilities in order to stabilize plan funding and allow for the provision of health care benefits to . . . retirees." § 19142(a)(2), 106 Stat. 3037, note following 26 U. S. C. § 9701; see also 138 Cong. Rec. 34001 (1992) (Conference Report on Coal Act) (explaining that, under the Coal Act, "those companies which employed the retirees in question, and thereby benefitted from their services, will be assigned responsibility for providing the health care benefits promised in their various collective bargaining agreements").

The Coal Act merged the 1950 and 1974 Benefit Plans into a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund (Combined Fund). See 26 U. S. C. §§ 9702(a)(1), (2).[2] The Combined Fund provides "substantially the same" health benefits to retirees and their dependents that they were receiving under the 1950 and 1974 Benefit Plans. See §§ 9703(b)(1), (f). It is financed by annual premiums assessed against "signatory coal operators," i. e., coal operators that signed any NBCWA or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans. See §§ 9701(b)(1), (3); § 9701(c)(1). Any signatory operator who "conducts or derives revenue from any business activity, whether or not in the coal industry," may be liable for those premiums. §§ 9706(a), 9701(c)(7). Where a signatory is no longer involved in any business activity, premiums may be levied against "related person[s]," including successors in interest and businesses or corporations under common control. §§ 9706(a), 9701(c)(2)(A).

The Commissioner of Social Security (Commissioner) calculates the premiums due from any signatory operator based

---

[2] The Coal Act also established another fund, the 1992 UMWA Benefit Plan, which is not at issue here. See 26 U. S. C. § 9712.

on the following formula, by which retirees are assigned to particular operators:

> "For purposes of this chapter, the Commissioner of Social Security shall . . . assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:
>
> "(1) First, to the signatory operator which—
>
> "(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
>
> "(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.
>
> "(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—
>
> "(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and
>
> "(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.
>
> "(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement." § 9706(a).

It is the application of the third prong of the allocation formula, § 9706(a)(3), to Eastern that we review in this case.[3]

---

[3] The Coal Act also provides for an allocation of liability for unassigned beneficiaries. See 26 U. S. C. § 9704(d). That liability, however, has thus far been covered through the transfer of funds from other sources. See § 9705; 30 U. S. C. § 1232(h). This case presents no question regarding the assignment to Eastern of liability for any retirees other than its own former employees.

## II

### A

Eastern was organized as a Massachusetts business trust in 1929, under the name Eastern Gas and Fuel Associates. Its current holdings include Boston Gas Company and a barge operator. Therefore, although Eastern is no longer involved in the coal industry, it is "in business" within the meaning of the Coal Act. Until 1965, Eastern conducted extensive coal mining operations centered in West Virginia and Pennsylvania. As a signatory to each NBCWA executed between 1947 and 1964, Eastern made contributions of over $60 million to the 1947 and 1950 W&R Funds. Brief for Petitioner 6.

In 1963, Eastern decided to transfer its coal-related operations to a subsidiary, Eastern Associated Coal Corp. (EACC). The transfer was completed by the end of 1965, and was described in Eastern's federal income tax return as an agreement by EACC to assume all of Eastern's liabilities arising out of coal mining and marketing operations in exchange for Eastern's receipt of EACC's stock. EACC made similar representations in Security and Exchange Commission filings, describing itself as the successor to Eastern's coal business. See App. (CA1) 117–118. At that time, the 1950 W&R Fund had a positive balance of over $145 million. 1966 Annual Report 3, App. (CA1) 1207.

Eastern retained its stock interest in EACC through a subsidiary corporation, Coal Properties Corp. (CPC), until 1987, and it received dividends of more than $100 million from EACC during that period. See Brief for Petitioner 6, n. 13. In 1987, Eastern sold its interest in CPC to respondent Peabody Holding Company, Inc. (Peabody). Under the terms of the agreement effecting the transfer, Peabody, CPC, and EACC assumed responsibility for payments to certain benefit plans, including the "Benefit Plan for UMWA Represented Employees of EACC and Subs." App. 206a, 210a.

As of June 30, 1987, the 1950 and 1974 Benefit Plans reported surplus assets, totaling over $33 million. House Report 9.

## B

Following enactment of the Coal Act, the Commissioner assigned to Eastern the obligation for Combined Fund premiums respecting over 1,000 retired miners who had worked for the company before 1966, based on Eastern's status as the pre-1978 signatory operator for whom the miners had worked for the longest period of time. See 26 U. S. C. § 9706(a). Eastern's premium for a 12-month period exceeded $5 million. See Brief for Petitioner 16.

Eastern responded by suing the Commissioner, as well as the Combined Fund and its trustees, in the United States District Court for the District of Massachusetts. Eastern asserted that the Coal Act, either on its face or as applied, violates substantive due process and constitutes a taking of its property in violation of the Fifth Amendment. Eastern also challenged the Commissioner's interpretation of the Coal Act. The District Court granted summary judgment for respondents on all claims, upholding both the Commissioner's interpretation of the Coal Act and the Act's constitutionality. *Eastern Enterprises* v. *Shalala*, 942 F. Supp. 684 (Mass. 1996).

The Court of Appeals for the First Circuit affirmed. *Eastern Enterprises* v. *Chater*, 110 F. 3d 150 (1997). The court rejected Eastern's challenge to the Commissioner's interpretation of the Coal Act. Addressing Eastern's substantive due process claim, the court described the Coal Act as "entitled to the most deferential level of judicial scrutiny," explaining that, "[w]here, as here, a piece of legislation is purely economic and does not abridge fundamental rights, a challenger must show that the legislature acted in an arbitrary and irrational way." *Id.,* at 155–156 (internal quotation marks omitted). In the court's view, the retroactive liability imposed by the Act was permissible "[a]s long as the

retroactive application . . . is supported by a legitimate legislative purpose furthered by rational means," for "judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches." *Id.*, at 156 (internal quotation marks omitted). The court concluded that Congress' purpose in enacting the Coal Act was legitimate and that Eastern's obligations under the Act are rationally related to those objectives, because Eastern's execution of pre-1974 NBCWA's contributed to miners' expectations of lifetime health benefits. *Id.*, at 157. The court rejected Eastern's argument that costs of retiree health benefits should be borne by post-1974 coal operators, reasoning that Eastern's proposal would require coal operators to fund health benefits for miners whom the operators had never employed. *Id.*, at 158, n. 5. The court also noted the substantial dividends that Eastern had received from EACC. *Id.*, at 158.

The court analyzed Eastern's claim that the Coal Act effects an uncompensated taking under the three factors set out in *Connolly* v. *Pension Benefit Guaranty Corporation,* 475 U. S. 211, 225 (1986): "(1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations, and (3) the nature of the governmental action." 110 F. 3d, at 160. With respect to the Act's economic impact on Eastern, the court observed that the Act "does not involve the total deprivation of an asset." *Ibid.* The Act's terms, the court found, "reflec[t] a sufficient degree of proportionality" because Eastern is assigned liability only for miners "whom it employed for a relevant (and relatively long) period of time," and then only if no post-1977 NBCWA signatory (or related person) can be found. *Ibid.* The court also rejected Eastern's contention that the Act unreasonably interferes with its investment-backed expectations, explaining that the pattern of federal intervention in the coal industry and Eastern's role in fostering an expectation of

lifetime health benefits meant that Eastern "had every reason to anticipate that it might be called upon to bear some of the financial burden that this expectation engendered." *Id.*, at 161. Finally, in assessing the nature of the challenged governmental action, the court determined that the Coal Act does not result in the physical invasion or permanent appropriation of Eastern's property, but merely "adjusts the benefits and burdens of economic life to promote the common good." *Ibid.* (internal quotation marks omitted). The court also noted that the premiums are disbursed to the privately operated Combined Fund, not to a government entity. For those reasons, the court concluded, "there is no basis whatever for [Eastern's] claim that the [Coal Act] transgresses the Takings Clause." *Ibid.*

Other Courts of Appeals have also upheld the Coal Act against constitutional challenges.[4] In view of the importance of the issues raised in this case, we granted certiorari. 522 U. S. 931 (1997).

### III

We begin with a threshold jurisdictional question, raised in the federal respondent's answer to Eastern's complaint: Whether petitioner's takings claim was properly filed in Federal District Court rather than the United States Court of Federal Claims. See App. (CA1) 40. Although the Commissioner no longer challenges the Court's adjudication of this action, see Brief for Federal Respondent 38–39, n. 30, it is appropriate that we clarify the basis of our jurisdiction over petitioner's claims.

---

[4] See, *e. g.*, *Holland* v. *Keenan Trucking Co.*, 102 F. 3d 736, 739–742 (CA4 1996); *Lindsey Coal Mining Co.* v. *Chater*, 90 F. 3d 688, 693–695 (CA3 1996); *In re Blue Diamond Coal Co.*, 79 F. 3d 516, 521–526 (CA6 1996), cert. denied, 519 U. S. 1055 (1997); *Davon, Inc.* v. *Shalala*, 75 F. 3d 1114, 1121–1130 (CA7), cert. denied, 519 U. S. 808 (1996); *In re Chateaugay Corp.*, 53 F. 3d 478, 486–496 (CA2), cert. denied *sub nom. LTV Steel Co.* v. *Shalala*, 516 U. S. 913 (1995).

Under the Tucker Act, 28 U. S. C. § 1491(a)(1), the Court of Federal Claims has exclusive jurisdiction to render judgment upon any claim against the United States for money damages exceeding $10,000 that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." Accordingly, a claim for just compensation under the Takings Clause must be brought to the Court of Federal Claims in the first instance, unless Congress has withdrawn the Tucker Act grant of jurisdiction in the relevant statute. See, *e. g., Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986, 1016–1019 (1984).

In this case, however, Eastern does not seek compensation from the Government. Instead, Eastern requests a declaratory judgment that the Coal Act violates the Constitution and a corresponding injunction against the Commissioner's enforcement of the Act as to Eastern. Such equitable relief is arguably not within the jurisdiction of the Court of Federal Claims under the Tucker Act. See *United States* v. *Mitchell,* 463 U. S. 206, 216 (1983) (explaining that, in order for a claim to be "cognizable under the Tucker Act," it "must be one for money damages against the United States"); see also, *e. g., Bowen* v. *Massachusetts,* 487 U. S. 879, 905 (1988).

Some Courts of Appeals have accepted the view that the Tucker Act does not apply to suits seeking only equitable relief, see *In re Chateaugay Corp.,* 53 F. 3d 478, 493 (CA2), cert. denied *sub nom. LTV Steel Co.* v. *Shalala,* 516 U. S. 913 (1995); *Southeast Kansas Community Action Program, Inc.* v. *Secretary of Agriculture,* 967 F. 2d 1452, 1455–1456 (CA10 1992), while others have concluded that a claim for equitable relief under the Takings Clause is hypothetical, and therefore not within the district courts' jurisdiction, until compensation has been sought and refused in the Court of Federal Claims, see *Bay View, Inc.* v. *Ahtna, Inc.,* 105 F. 3d 1281,

1286 (CA9 1997); *Rose Acre Farms, Inc.* v. *Madigan,* 956 F. 2d 670, 673–674 (CA7), cert. denied, 506 U. S. 820 (1992).

On the one hand, this Court's precedent can be read to support the latter conclusion that regardless of the nature of relief sought, the availability of a Tucker Act remedy renders premature any takings claim in federal district court. See *Preseault* v. *ICC,* 494 U. S. 1, 11 (1990); see also *Monsanto, supra,* at 1016. On the other hand, in a case such as this one, it cannot be said that monetary relief against the Government is an available remedy. See Brief for Federal Respondent 38–39, n. 30. The payments mandated by the Coal Act, although calculated by a Government agency, are paid to the privately operated Combined Fund. Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for "[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation." *In re Chateaugay Corp.,* 53 F. 3d, at 493. Accordingly, the "presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds" mandated by the Government. *Ibid.* In that situation, a claim for compensation "would entail an utterly pointless set of activities." *Student Loan Marketing Assn.* v. *Riley,* 104 F. 3d 397, 401 (CADC), cert. denied, 522 U. S. 913 (1997). Instead, as we explained in *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.,* 438 U. S. 59, 71, n. 15 (1978), the Declaratory Judgment Act "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."

Moreover, in situations analogous to this case, we have assumed the lack of a compensatory remedy and have granted equitable relief for Takings Clause violations without discussing the applicability of the Tucker Act. See, *e. g., Babbitt* v. *Youpee,* 519 U. S. 234, 243–245 (1997); *Hodel* v. *Ir-*

*ving*, 481 U. S. 704, 716–718 (1987). Without addressing the basis of this Court's jurisdiction, we have also upheld similar statutory schemes against Takings Clause challenges. See *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 641–647 (1993); *Connolly*, 475 U. S., at 221–228. "While we are not bound by previous exercises of jurisdiction in cases in which our power to act was not questioned but was passed *sub silentio*, neither should we disregard the implications of an exercise of judicial authority assumed to be proper" in previous cases. *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 307 (1962) (citations omitted). Based on the nature of the taking alleged in this case, we conclude that the declaratory judgment and injunction sought by petitioner constitute an appropriate remedy under the circumstances, and that it is within the district courts' power to award such equitable relief.

## IV

### A

The Takings Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." The aim of the Clause is to prevent the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960).

This case does not present the "classi[c] taking" in which the government directly appropriates private property for its own use. See *United States* v. *Security Industrial Bank*, 459 U. S. 70, 78 (1982). Although takings problems are more commonly presented when "the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978) (citation omitted),

economic regulation such as the Coal Act may nonetheless effect a taking, see *Security Industrial Bank, supra,* at 78. See also *Calder* v. *Bull,* 3 Dall. 386, 388 (1798) (opinion of Chase, J.) ("It is against all reason and justice" to presume that the legislature has been entrusted with the power to enact "a law that takes *property* from A. and gives it to B"). By operation of the Act, Eastern is "permanently deprived of those assets necessary to satisfy its statutory obligation, not to the Government, but to [the Combined Fund]," *Connolly, supra,* at 222, and "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change," *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416 (1922).

Of course, a party challenging governmental action as an unconstitutional taking bears a substantial burden. See *United States* v. *Sperry Corp.,* 493 U. S. 52, 60 (1989). Government regulation often "curtails some potential for the use or economic exploitation of private property," *Andrus* v. *Allard,* 444 U. S. 51, 65 (1979), and "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong, supra,* at 48. In light of that understanding, the process for evaluating a regulation's constitutionality involves an examination of the "justice and fairness" of the governmental action. See *Andrus,* 444 U. S., at 65. That inquiry, by its nature, does not lend itself to any set formula, see *ibid.,* and the determination whether " 'justice and fairness' require that economic injuries caused by public action [must] be compensated by the government, rather than remain disproportionately concentrated on a few persons," is essentially ad hoc and fact intensive, *Kaiser Aetna* v. *United States,* 444 U. S. 164, 175 (1979) (internal quotation marks omitted). We have identified several factors, however, that have particular significance: "[T]he economic impact of the regulation, its interference with reasonable investment backed expectations, and

the character of the governmental action." *Ibid.;* see also *Connolly, supra,* at 224–225.

## B

Our analysis in this case is informed by previous decisions considering the constitutionality of somewhat similar legislative schemes. In *Usery* v. *Turner Elkhorn Mining Co.,* 428 U. S. 1 (1976), we had occasion to review provisions of the Black Lung Benefits Act of 1972, 30 U. S. C. § 901 *et seq.,* which required coal operators to compensate certain miners and their survivors for death or disability due to black lung disease caused by employment in coal mines. Coal operators challenged the provisions of the Act relating to miners who were no longer employed in the industry, arguing that those provisions violated substantive due process by imposing "an unexpected liability for past, completed acts that were legally proper and, at least in part, unknown to be dangerous at the time." 428 U. S., at 15.

In rejecting the operators' challenge, we explained that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Ibid.* We observed that stricter limits may apply to Congress' authority when legislation operates in a retroactive manner, *id.,* at 16–17, but concluded that the assignment of liability for black lung benefits was "justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor," *id.,* at 18.

Several years later, we confronted a due process challenge to the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1208. See *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.,* 467 U. S. 717 (1984). The MPPAA was enacted to supplement ERISA, 29 U. S. C. § 1001 *et seq.,* which established the Pension Benefit Guar-

anty Corporation (PBGC) to administer an insurance program for vested pension benefits. For a temporary period, the PBGC had discretionary authority to pay benefits upon the termination of multiemployer pension plans, after which insurance coverage would become mandatory. If the PBGC exercised that authority, employers who had contributed to the plan during the five years before its termination faced liability for an amount proportional to their share of contributions to the plan during that period. See 467 U. S., at 720–721.

Despite Congress' effort to insure multiemployer plan benefits through ERISA, many multiemployer plans were in a precarious financial position as the date for mandatory coverage approached. After a series of hearings and debates, Congress passed the MPPAA, which imposed a payment obligation upon any employer withdrawing from a multiemployer pension plan, the amount of which depended on the employer's share of the plan's unfunded vested benefits. The MPPAA applied retroactively to withdrawals within the five months preceding the statute's enactment. *Id.*, at 721–725.

In *Gray*, an employer that had participated in a multiemployer pension plan brought a due process challenge to the statutory liability stemming from its withdrawal from the plan four months before the MPPAA was enacted. Relying on our decision in *Turner Elkhorn*, we rejected the employer's claim. It was rational, we determined, for Congress to impose retroactive liability "to prevent employers from taking advantage of a lengthy legislative process [by] withdrawing while Congress debated necessary revisions in the statute." 467 U. S., at 731. In addition, we explained, "as the [MPPAA] progressed through the legislative process, Congress advanced the effective date chosen so that it would encompass only that retroactive time period that Congress believed would be necessary to accomplish its purposes." *Ibid.* Accordingly, we concluded that the MPPAA exem-

plified the "customary congressional practice" of enacting "retroactive statutes confined to short and limited periods required by the practicalities of producing national legislation." *Ibid.* (internal quotation marks omitted).

This Court again considered the constitutionality of the MPPAA in *Connolly* v. *Pension Benefit Guaranty Corporation,* 475 U. S. 211 (1986), which presented the question whether the MPPAA's withdrawal liability provisions effected an unconstitutional taking. The action was brought by trustees of a multiemployer pension plan that, under collective bargaining agreements, received contributions from employers on the basis of the hours worked by their employees. We agreed that the liability imposed by the MPPAA constituted a permanent deprivation of assets, but we rejected the notion that "such a statutory liability to a private party always constitutes an uncompensated taking prohibited by the Fifth Amendment." *Id.,* at 222. "In the course of regulating commercial and other human affairs," we explained, "Congress routinely creates burdens for some that directly benefit others." *Id.,* at 223. Consistent with our decisions in *Gray* and *Turner Elkhorn,* we reasoned that legislation is not unlawful solely because it upsets otherwise settled expectations.

Moreover, given our holding in *Gray* that the MPPAA did not violate due process, we concluded that "it would be surprising indeed to discover" that the statute effected a taking. 475 U. S., at 223. Although the employers in *Connolly* had contractual agreements expressly limiting their contributions to the multiemployer plan, we observed that "[c]ontracts, however express, cannot fetter the constitutional authority of Congress" and "the fact that legislation disregards or destroys existing contractual rights does not always transform the regulation into an illegal taking." *Id.,* at 223–224 (internal quotation marks omitted). Focusing on the three factors of "particular significance"—the economic impact of the regulation, the extent to which the regulation

interferes with investment-backed expectations, and the character of the governmental action—we determined that the MPPAA did not violate the Takings Clause. *Id.*, at 225.

The governmental action at issue in *Connolly* was not a physical invasion of employers' assets; rather, it "safeguard[ed] the participants in multiemployer pension plans by requiring a withdrawing employer to fund its share of the plan obligations incurred during its association with the plan." *Ibid.* In addition, although the amounts assessed under the MPPAA were substantial, we found it important that "[t]he assessment of withdrawal liability [was] not made in a vacuum, . . . but directly depend[ed] on the relationship between the employer and the plan to which it had made contributions." *Ibid.* Further, "a significant number of provisions in the Act . . . moderate[d] and mitigate[d] the economic impact of an individual employer's liability." *Id.*, at 225–226. Accordingly, we found "nothing to show that the withdrawal liability actually imposed on an employer w[ould] always be out of proportion to its experience with the plan." *Id.*, at 226. Nor did the MPPAA interfere with employers' reasonable investment-backed expectations, for, by the time of the MPPAA's enactment, "[p]rudent employers . . . had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations." *Id.*, at 227. For those reasons, we determined that "fairness and justice" did not require anyone other than the withdrawing employers and the remaining parties to the pension agreements to bear the burden of funding employees' vested benefits. *Ibid.*

We once more faced challenges to the MPPAA under the Due Process and Takings Clauses in *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602 (1993). In that case, the employer focused on the fact that its contractual commitment to the multiemployer plan did not impose withdrawal liabil-

528

ity. We first rejected the employer's substantive due process challenge based on our decisions in *Gray* and *Turner Elkhorn*, notwithstanding the employer's argument that the MPPAA imposed upon it a higher liability than its contract contemplated. 508 U. S., at 636–641. The claim under the Takings Clause, meanwhile, was resolved by *Connolly.* We explained that, as in that case, the Government had not occupied or destroyed the employer's property. 508 U. S., at 643–644. As to the severity of the MPPAA's impact, we concluded that the employer had not shown that its withdrawal liability was "'out of proportion to its experience with the plan'" *Id.*, at 645 (quoting *Connolly, supra,* at 226). Turning to the employer's reasonable investment-backed expectations, we repeated our observation in *Connolly* that "pension plans had long been subject to federal regulation." 508 U. S., at 645. Moreover, although the employer's liability under the MPPAA exceeded ERISA's original cap on withdrawal liability, we found that there was "no reasonable basis to expect that [ERISA's] legislative ceiling would never be lifted." *Id.*, at 646. In sum, as in *Connolly,* the employer "voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA," making the burden the MPPAA imposed upon it neither unfair nor unjust. 508 U. S., at 646–647 (internal quotation marks omitted).

Our opinions in *Turner Elkhorn, Connolly,* and *Concrete Pipe* make clear that Congress has considerable leeway to fashion economic legislation, including the power to affect contractual commitments between private parties. Congress also may impose retroactive liability to some degree, particularly where it is "confined to short and limited periods required by the practicalities of producing national legislation." *Gray,* 467 U. S., at 731 (internal quotation marks omitted). Our decisions, however, have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties

that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience.

C

We believe that the Coal Act's allocation scheme, as applied to Eastern, presents such a case. We reach that conclusion by applying the three factors that traditionally have informed our regulatory takings analysis. Although JUSTICE KENNEDY and JUSTICE BREYER would pursue a different course in evaluating the constitutionality of the Coal Act, they acknowledge that this Court's opinions in *Connolly* and *Concrete Pipe* indicate that the regulatory takings framework is germane to legislation of this sort. See *post*, at 545–546 (KENNEDY, J., concurring in judgment and dissenting in part); *post*, at 555–556 (BREYER, J., dissenting).

As to the first factor relevant in assessing whether a regulatory taking has occurred, economic impact, there is no doubt that the Coal Act has forced a considerable financial burden upon Eastern. The parties estimate that Eastern's cumulative payments under the Act will be on the order of $50 to $100 million. See Brief for Petitioner 2 ($100 million); Brief for Respondents UMWA Combined Benefit Fund et al. 46 ($51 million). Eastern's liability is thus substantial, and the company is clearly deprived of the amounts it must pay the Combined Fund. See *Connolly*, 475 U. S., at 222. The fact that the Federal Government has not specified the assets that Eastern must use to satisfy its obligation does not negate that impact. It is clear that the Act requires Eastern to turn over a dollar amount established by the Commissioner under a timetable set by the Act, with the threat of severe penalty if Eastern fails to comply. See 26 U. S. C. §§ 9704(a) and (b) (directing liable operators to pay annual premiums as computed by the Commissioner); § 9707 (imposing, with limited exceptions, a penalty of $100 per day per eligible beneficiary if payment is not made in accordance with § 9704).

That liability is not, of course, a permanent physical occupation of Eastern's property of the kind that we have viewed as a *per se* taking. See *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U. S. 419, 441 (1982). But our decisions upholding the MPPAA suggest that an employer's statutory liability for multiemployer plan benefits should reflect some "proportion[ality] to its experience with the plan." *Concrete Pipe*, 508 U. S., at 645 (internal quotation marks omitted); see also *Connolly, supra,* at 225 (noting that employer's liability under the MPPAA "directly depend[ed] on the relationship between the employer and the plan to which it had made contributions"). In *Concrete Pipe* and *Connolly,* the employers had "voluntarily negotiated and maintained a pension plan which was determined to be within the strictures of ERISA," *Concrete Pipe, supra,* at 646 (internal quotation marks omitted); *Connolly, supra,* at 227, and consequently, the statutory liability was linked to the employers' conduct.

Here, however, while Eastern contributed to the 1947 and 1950 W&R Funds, it ceased its coal mining operations in 1965 and neither participated in negotiations nor agreed to make contributions in connection with the Benefit Plans under the 1974, 1978, or subsequent NBCWA's. It is the latter agreements that first suggest an industry commitment to the funding of lifetime health benefits for both retirees and their family members. Although EACC continued mining coal until 1987 as a subsidiary of Eastern, Eastern's liability under the Act bears no relationship to its ownership of EACC; the Act assigns Eastern responsibility for benefits relating to miners that Eastern itself, not EACC, employed, while EACC would be assigned the responsibility for any miners that it had employed. See 26 U. S. C. § 9706(a). Thus, the Act does not purport, as JUSTICE BREYER suggests, *post,* at 566, to assign liability to Eastern based on the " 'last man out' problem" that developed after benefits were significantly expanded in 1974. During the years in which

Eastern employed miners, retirement and health benefits were far less extensive than under the 1974 NBCWA, were unvested, and were fully subject to alteration or termination. Before 1974, as JUSTICE BREYER notes, Eastern could not have contemplated liability for the provision of lifetime benefits to the widows of deceased miners, see *post*, at 562–563, a beneficiary class that is likely to be substantial. See General Accounting Office, Human Resources Division Report, Retired Coal Miners' Health Benefits 7 (July 1992) (reporting to Congress that widows composed 45% of beneficiaries in Jan. 1992); see also Brief for Petitioner 45, n. 54 (citing affidavit that 75% of the beneficiaries assigned to Eastern are spouses or dependent children of miners). Although Eastern at one time employed the Combined Fund beneficiaries that it has been assigned under the Coal Act, the correlation between Eastern and its liability to the Combined Fund is tenuous, and the amount assessed against Eastern resembles a calculation "made in a vacuum." See *Connolly, supra*, at 225. The company's obligations under the Act depend solely on its roster of employees some 30 to 50 years before the statute's enactment, without any regard to responsibilities that Eastern accepted under any benefit plan the company itself adopted.

It is true that Eastern may be able to seek indemnification from EACC or Peabody. But although the Act preserves Eastern's right to pursue indemnification, see 26 U. S. C. § 9706(f)(6), it does not confer any right of reimbursement. See also Conference Report on Coal Act, 138 Cong. Rec., at 34004 (explaining that the Coal Act allows parties to "enter into private litigation to enforce . . . contracts for indemnification," but "does not create new private rights of action"). Moreover, the possibility of indemnification does not alter the fact that Eastern has been assessed over $5 million in Combined Fund premiums and that its liability under the Coal Act will continue for many years. To the extent that Eastern may have entered into contractual arrangements to

insure itself against liabilities arising out of its former coal operations, that indemnity is neither enhanced nor supplanted by the Coal Act and does not affect the availability of the declaratory relief Eastern seeks.

We are also not persuaded by respondents' argument that the Coal Act "moderate[s] and mitigate[s] the economic impact" upon Eastern. See *Connolly*, 475 U. S., at 225–226. Although Eastern is not assigned the premiums for former employees who later worked for companies that signed the 1978 NBCWA, see 26 U. S. C. §§ 9706(a)(1), (2), Eastern had no control over the activities of its former employees subsequent to its departure from the coal industry in 1965. By contrast, the provisions of the MPPAA that we identified as potentially moderating the employer's liability in *Connolly* were generally within the employer's control. See 475 U. S., at 226, n. 8. The mere fact that Eastern is not forced to bear the burden of lifetime benefits respecting *all* of its former employees does not mean that the company's liability for some of those employees is not a significant economic burden.

For similar reasons, the Coal Act substantially interferes with Eastern's reasonable investment-backed expectations. The Act's beneficiary allocation scheme reaches back 30 to 50 years to impose liability against Eastern based on the company's activities between 1946 and 1965. Thus, even though the Act mandates only the payment of future health benefits, it nonetheless "attaches new legal consequences to [an employment relationship] completed before its enactment." *Landgraf* v. *USI Film Products*, 511 U. S. 244, 270 (1994).

Retroactivity is generally disfavored in the law, *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988), in accordance with "fundamental notions of justice" that have been recognized throughout history, *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 855 (1990) (SCALIA, J., concurring). See also, *e. g., Dash* v. *Van Kleeck*, 7 Johns. *477, *503 (NY 1811) ("It is a principle in the *Eng-*

*lish* common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect"); H. Broom, Legal Maxims 24 (8th ed. 1911) ("Retrospective laws are, as a rule, of questionable policy, and contrary to the general principle that legislation by which the conduct of mankind is to be regulated ought to deal with future acts, and ought not to change the character of past transactions carried on upon the faith of the then existing law"). In his Commentaries on the Constitution, Justice Story reasoned: "Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." 2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891). A similar principle abounds in the laws of other nations. See, *e. g., Gustavson Drilling (1964) Ltd.* v. *Minister of National Revenue,* 66 D. L. R. 3d 449, 462 (Can. 1975) (discussing rule that statutes should not be construed in a manner that would impair existing property rights); The French Civil Code, Preliminary Title, Art. 2, p. 2 ("Legislation only provides for the future; it has no retroactive effect") (J. Crabb transl., rev. ed. 1995); Aarnio, Statutory Interpretation in Finland 151, in Interpreting Statutes: A Comparative Study (D. MacCormick & R. Summers eds. 1991) (discussing prohibition against retroactive legislation). "Retroactive legislation," we have explained, "presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp.* v. *Romein,* 503 U. S. 181, 191 (1992).

Our Constitution expresses concern with retroactive laws through several of its provisions, including the *Ex Post Facto* and Takings Clauses. *Landgraf, supra,* at 266. In *Calder* v. *Bull,* 3 Dall. 386 (1798), this Court held that the *Ex Post Facto* Clause is directed at the retroactivity of penal legislation, while suggesting that the Takings Clause provides

a similar safeguard against retrospective legislation concerning property rights. See *id.*, at 394 (opinion of Chase, J.) ("The restraint against making any *ex post facto laws* was not considered, by the framers of the constitution, as extending to prohibit the depriving a citizen even of a *vested right to property;* or the provision, 'that *private* property should not be taken for public use, without just compensation,' was unnecessary"). In *Security Industrial Bank,* we considered a Takings Clause challenge to a Bankruptcy Code provision permitting debtors to avoid certain liens, possibly including those predating the statute's enactment. We expressed "substantial doubt whether the retroactive destruction of the appellees' liens . . . comport[ed] with the Fifth Amendment," and therefore construed the statute as applying only to lien interests vesting after the legislation took effect. 459 U. S., at 78–79. Similar concerns led this Court to strike down a bankruptcy provision as an unconstitutional taking where it affected substantive rights acquired before the provision was adopted. *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, 601–602 (1935).

Like those provisions, the Coal Act operates retroactively, divesting Eastern of property long after the company believed its liabilities under the 1950 W&R Fund to have been settled. And the extent of Eastern's retroactive liability is substantial and particularly far reaching. Even in areas in which retroactivity is generally tolerated, such as tax legislation, some limits have been suggested. See, *e. g., United States* v. *Darusmont,* 449 U. S. 292, 296–297 (1981) *(per curiam)* (noting Congress' practice of confining retroactive application of tax provisions to "short and limited periods"). The distance into the past that the Act reaches back to impose a liability on Eastern and the magnitude of that liability raise substantial questions of fairness. See *Connolly, supra,* at 229 (O'CONNOR, J., concurring) (questioning constitutionality of imposing liability on "employers for unfunded benefits that accrued in the past under a pension plan

whether or not the employers had agreed to ensure that benefits would be fully funded"); see also *Landgraf*, 511 U. S., at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted").

Respondents and their *amici curiae* assert that the extent of retroactive liability is justified because there was an implicit, industrywide agreement during the time that Eastern was involved in the coal industry to fund lifetime health benefits for qualifying miners and their dependents. That contention, however, is not supported by the pre-1974 NBCWA's. No contrary conclusion can be drawn from the few isolated statements of individuals involved in the coal industry, see, *e. g.*, Brief for Respondents Peabody Holding Company, Inc., et al. 8–10, or from statements of Members of Congress while considering legislative responses to the issue of funding retiree benefits. Moreover, even though retirees received medical benefits before 1974, and perhaps developed a corresponding expectation that those benefits would continue, the Coal Act imposes liability respecting a much broader range of beneficiaries. In any event, the question is not whether miners had an expectation of lifetime benefits, but whether Eastern should bear the cost of those benefits as to miners it employed before 1966.

Eastern only participated in the 1947 and 1950 W&R Funds, which operated on a pay-as-you-go basis, and under which the degree of benefits and the classes of beneficiaries were subject to the trustees' discretion. Not until 1974, when ERISA forced revisions to the 1950 W&R Fund, could lifetime medical benefits under the multiemployer agreement have been viewed as promised. Eastern was no longer in the industry when the evergreen and guarantee clauses of the 1978 and subsequent NBCWA's shifted the 1950 and 1974 Benefit Plans from a defined contribution framework to a guarantee of defined benefits, at least for the life of the

agreements. See *Connolly*, 475 U. S., at 230–231 (O'CON-
NOR, J., concurring) (imposition of liability "without regard
to the extent of a particular employer's actual responsibility
for [a benefit] plan's promise of fixed benefits to employees"
could raise serious concerns under the Takings Clause).
Thus, unlike the pension withdrawal liability upheld in *Con-
crete Pipe* and *Connolly*, the Coal Act's scheme for allocation
of Combined Fund premiums is not calibrated either to East-
ern's past actions or to any agreement—implicit or other-
wise—by the company. Nor would the pattern of the Fed-
eral Government's involvement in the coal industry have
given Eastern "sufficient notice" that lifetime health benefits
might be guaranteed to retirees several decades later. See
*Connolly, supra,* at 227.

Eastern's liability also differs from coal operators' respon-
sibility for benefits under the Black Lung Benefits Act of
1972. That legislation merely imposed "liability for the
effects of disabilities bred in the past [that] is justified as a
rational measure to spread the costs of the employees' disa-
bilities to those who have profited from the fruits of their
labor." *Turner Elkhorn*, 428 U. S., at 18. Likewise, East-
ern might be responsible for employment-related health
problems of all former employees whether or not the cost
was foreseen at the time of employment, see *id.,* at 16, but
there is no such connection here. There is no doubt that
many coal miners sacrificed their health on behalf of this
country's industrial development, and we do not dispute that
some members of the industry promised lifetime medical
benefits to miners and their dependents during the 1970's.
Nor do we, as JUSTICE STEVENS suggests, *post*, at 553, ques-
tion Congress' policy decision that the miners are entitled to
relief. But the Constitution does not permit a solution to
the problem of funding miners' benefits that imposes such
a disproportionate and severely retroactive burden upon
Eastern.

Finally, the nature of the governmental action in this case is quite unusual. That Congress sought a legislative remedy for what it perceived to be a grave problem in the funding of retired coal miners' health benefits is understandable; complex problems of that sort typically call for a legislative solution. When, however, that solution singles out certain employers to bear a burden that is substantial in amount, based on the employers' conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused, the governmental action implicates fundamental principles of fairness underlying the Takings Clause. Eastern cannot be forced to bear the expense of lifetime health benefits for miners based on its activities decades before those benefits were promised. Accordingly, in the specific circumstances of this case, we conclude that the Coal Act's application to Eastern effects an unconstitutional taking.

## D

Eastern also claims that the manner in which the Coal Act imposes liability upon it violates substantive due process. To succeed, Eastern would be required to establish that its liability under the Act is "arbitrary and irrational." *Turner Elkhorn, supra,* at 15. Our analysis of legislation under the Takings and Due Process Clauses is correlated to some extent, see *Connolly, supra,* at 223, and there is a question whether the Coal Act violates due process in light of the Act's severely retroactive impact. At the same time, this Court has expressed concerns about using the Due Process Clause to invalidate economic legislation. See *Ferguson* v. *Skrupa,* 372 U. S. 726, 731 (1963) (noting "our abandonment of the use of the 'vague contours' of the Due Process Clause to nullify laws which a majority of the Court believ[e] to be economically unwise" (footnote omitted)); see also *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483, 488 (1955) ("The day is gone when this Court uses the Due Process Clause . . . to strike down . . . laws, regulatory of business

and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought"). Because we have determined that the third tier of the Coal Act's allocation scheme violates the Takings Clause as applied to Eastern, we need not address Eastern's due process claim. Nor do we consider the first two tiers of the Act's allocation scheme, 26 U. S. C. §§ 9706(a)(1) and (2), as the liability that has been imposed on Eastern arises only under the third tier. Cf. *Printz* v. *United States*, 521 U. S. 898, 934–935 (1997).

## V

In enacting the Coal Act, Congress was responding to a serious problem with the funding of health benefits for retired coal miners. While we do not question Congress' power to address that problem, the solution it crafted improperly places a severe, disproportionate, and extremely retroactive burden on Eastern. Accordingly, we conclude that the Coal Act's allocation of liability to Eastern violates the Takings Clause, and that 26 U. S. C. § 9706(a)(3) should be enjoined as applied to Eastern. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE THOMAS, concurring.

JUSTICE O'CONNOR's opinion correctly concludes that the Coal Act's imposition of retroactive liability on petitioner violates the Takings Clause. I write separately to emphasize that the *Ex Post Facto* Clause of the Constitution, Art. I, § 9, cl. 3, even more clearly reflects the principle that "[r]etrospective laws are, indeed, generally unjust." 2 J. Story, Commentaries on the Constitution § 1398, p. 272 (5th ed. 1891). Since *Calder* v. *Bull*, 3 Dall. 386 (1798), however, this Court has considered the *Ex Post Facto* Clause to apply only in the criminal context. I have never been convinced of the soundness of this limitation, which in *Calder* was

principally justified because a contrary interpretation would render the Takings Clause unnecessary. See *id.*, at 394 (opinion of Chase, J.). In an appropriate case, therefore, I would be willing to reconsider *Calder* and its progeny to determine whether a retroactive civil law that passes muster under our current Takings Clause jurisprudence is nonetheless unconstitutional under the *Ex Post Facto* Clause. Today's case, however, does present an unconstitutional taking, and I join JUSTICE O'CONNOR's well-reasoned opinion in full.

JUSTICE KENNEDY, concurring in the judgment and dissenting in part.

The plurality's careful assessment of the history and purpose of the statute in question demonstrates the necessity to hold it arbitrary and beyond the legitimate authority of the Government to enact. In my view, which is in full accord with many of the plurality's conclusions, the relevant portions of the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), 26 U. S. C. § 9701 *et seq.* (1994 ed. and Supp. II), must be invalidated as contrary to essential due process principles, without regard to the Takings Clause of the Fifth Amendment. I concur in the judgment holding the Coal Act unconstitutional but disagree with the plurality's Takings Clause analysis, which, it is submitted, is incorrect and quite unnecessary for decision of the case. I must record my respectful dissent on this issue.

I

The final Clause of the Fifth Amendment states:

"[N]or shall private property be taken for public use, without just compensation." U. S. Const., Amdt. 5.

The provision is known as the Takings Clause. The concept of a taking under the Clause has become a term of art, and my discussion begins here.

Our cases do not support the plurality's conclusion that the Coal Act takes property. The Coal Act imposes a staggering financial burden on the petitioner, Eastern Enterprises, but it regulates the former mine owner without regard to property. It does not operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest. The Coal Act does not appropriate, transfer, or encumber an estate in land (e. g., a lien on a particular piece of property), a valuable interest in an intangible (e. g., intellectual property), or even a bank account or accrued interest. The law simply imposes an obligation to perform an act, the payment of benefits. The statute is indifferent as to how the regulated entity elects to comply or the property it uses to do so. To the extent it affects property interests, it does so in a manner similar to many laws; but until today, none were thought to constitute takings. To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise.

As the role of Government expanded, our experience taught that a strict line between a taking and a regulation is difficult to discern or to maintain. This led the Court in *Pennsylvania Coal Co.* v. *Mahon*, 260 U. S. 393 (1922), to try to span the two concepts when specific property was subjected to what the owner alleged to be excessive regulation. "The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Id.*, at 415. The quoted sentence is, of course, the genesis of the so-called regulatory takings doctrine. See *Lucas* v. *South Carolina Coastal Council*, 505 U. S. 1003, 1014 (1992) ("Prior to Justice Holmes's exposition in *Pennsylvania Coal Co.* v. *Mahon*, it was generally thought that the Takings Clause reached only a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession'" (citations omitted)). Without denigrating the importance the

regulatory takings concept has assumed in our law, it is fair to say it has proved difficult to explain in theory and to implement in practice. Cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law. See *Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 123 (1978) ("The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty"); *Kaiser Aetna* v. *United States*, 444 U. S. 164, 175 (1979) (the regulatory taking question requires an "essentially ad hoc, factual inquir[y]").

Until today, however, one constant limitation has been that in all of the cases where the regulatory taking analysis has been employed, a specific property right or interest has been at stake. After the decision in *Pennsylvania Coal Co.* v. *Mahon, supra,* we confronted cases where specific and identified properties or property rights were alleged to come within the regulatory takings prohibition: air rights for high-rise buildings, *Penn Central, supra;* zoning on parcels of real property, *e. g., MacDonald, Sommer & Frates* v. *Yolo County,* 477 U. S. 340 (1986); *Agins* v. *City of Tiburon,* 447 U. S. 255 (1980); trade secrets, *Ruckelshaus* v. *Monsanto Co.,* 467 U. S. 986 (1984); right of access to property, *e. g., Prune-Yard Shopping Center* v. *Robins,* 447 U. S. 74 (1980); *Kaiser Aetna, supra;* right to affix on structures, *Loretto* v. *Teleprompter Manhattan CATV Corp.,* 458 U. S. 419 (1982); right to transfer property by devise or intestacy, *e. g., Hodel* v. *Irving,* 481 U. S. 704 (1987); creation of an easement, *Dolan* v. *City of Tigard,* 512 U. S. 374 (1994); *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825 (1987); right to build or improve, *Lucas, supra;* liens on real property, *Armstrong* v. *United States,* 364 U. S. 40 (1960); right to mine coal, *Keystone Bituminous Coal Assn.* v. *DeBenedictis,* 480 U. S. 470 (1987); right to sell personal property, *Andrus* v. *Allard,* 444 U. S. 51 (1979); and the right to extract mineral deposits, *Goldblatt* v. *Hempstead,* 369 U. S. 590 (1962); *United States*

v. *Central Eureka Mining Co.*, 357 U. S. 155 (1958). The regulations in the cited cases were challenged as being so excessive as to destroy, or take, a specific property interest. The plurality's opinion disregards this requirement and, by removing this constant characteristic from takings analysis, would expand an already difficult and uncertain rule to a vast category of cases not deemed, in our law, to implicate the Takings Clause.

The difficulties in determining whether there is a taking or a regulation even where a property right or interest is identified ought to counsel against extending the regulatory takings doctrine to cases lacking this specificity. The existence of at least this outer boundary for application of the regulatory takings rule provides some necessary predictability for governmental entities. Our definition of a taking, after all, is binding on all of the States as well as the Federal Government. The plurality opinion would throw one of the most difficult and litigated areas of the law into confusion, subjecting States and municipalities to the potential of new and unforeseen claims in vast amounts. The existing category of cases involving specific property interests ought not to be obliterated by extending regulatory takings analysis to the amorphous class of cases embraced by the plurality's opinion today.

True, the burden imposed by the Coal Act may be just as great if the Government had appropriated one of Eastern's plants, but the mechanism by which the Government injures Eastern is so unlike the act of taking specific property that it is incongruous to call the Coal Act a taking, even as that concept has been expanded by the regulatory takings principle. In the terminology of our regulatory takings analysis, the character of the governmental action renders the Coal Act not a taking of property. While the usual taking occurs when the government physically acquires property for itself, *e. g., Chicago, B. & Q. R. Co.* v. *Chicago*, 166 U. S. 226 (1897), our regulatory takings analysis recognizes a taking may occur when property is not appropriated by the government

or is transferred to other private parties. See, *e. g., United States* v. *Security Industrial Bank,* 459 U. S. 70, 78 (1982) ("[O]ur cases show that takings analysis is not necessarily limited to outright acquisitions by the government for itself"); *Loretto, supra* (transfer of physical space from landlords to cable companies).

As the range of governmental conduct subjected to takings analysis has expanded, however, we have been careful not to lose sight of the importance of identifying the property allegedly taken, lest all governmental action be subjected to examination under the constitutional prohibition against taking without just compensation, with the attendant potential for money damages. We have asked how the challenged governmental action is implemented with particular emphasis on the extent to which a specific property right is affected. See *id.*, at 432 (physical invasion "is a government action of such a unique character that it is a taking without regard to other factors"); *Hodel, supra,* at 715–716 (declaring a law, which otherwise would not be a taking because of its insignificant economic impact, a taking because the character of the governmental action destroyed the right to pass property to one's heirs, a right which "has been part of the Anglo-American legal system since feudal times"); *Penn Central, supra,* at 124 ("A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good" (citation omitted)). The Coal Act neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms. The liability imposed on Eastern no doubt will reduce its net worth and its total value, but this can be said of any law which has an adverse economic effect.

The circumstance that the statute does not take money for the Government but instead makes it payable to third persons is not a factor I rely upon to show the lack of a taking.

While there are instances where the Government's self-enrichment may make it all the more evident a taking has occurred, *e. g., Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155 (1980); *United States* v. *Causby,* 328 U. S. 256 (1946), the Government ought not to have the capacity to give itself immunity from a takings claim by the device of requiring the transfer of property from one private owner directly to another. Cf. *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229 (1984). At the same time, the Government's imposition of an obligation between private parties, or destruction of an existing obligation, must relate to a specific property interest to implicate the Takings Clause. For example, in *United States* v. *Security Industrial Bank,* we confronted a statute which was alleged to destroy an existing creditor's lien in certain chattels to the benefit of the debtor. We acknowledged that, given the nature of the property interest at stake, which resembled a contractual obligation, the takings challenge "fits but awkwardly into the analytic framework" of our regulatory takings analysis. 459 U. S., at 75. We decided the analysis could apply because the property interest was a "traditional property interes[t]," though in the end the statute was found inapplicable to the lien at issue. In so holding, we relied on *Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555 (1935), which invalidated the Frazier-Lemke Farm-Mortgage Act, because it interfered with mortgages on farms and thus worked a "'taking of substantive rights in specific property acquired by the Bank prior to'" the Act. 459 U. S., at 77 (quoting *Radford, supra,* at 590, 601). Unlike the statutes at issue in *Security Industrial Bank* and *Radford,* the Coal Act does not affect an obligation relating to a specific property interest.

If the plurality is adopting its novel and expansive concept of a taking in order to avoid making a normative judgment about the Coal Act, it fails in the attempt; for it must make the normative judgment in all events. See, *e. g., ante,* at 537 ("[T]he governmental action implicates fundamental princi-

ples of fairness"). The imprecision of our regulatory takings doctrine does open the door to normative considerations about the wisdom of government decisions. See, *e. g., Agins* v. *City of Tiburon,* 447 U. S., at 260 (zoning constitutes a taking if it does not "substantially advance legitimate state interests"). This sort of analysis is in uneasy tension with our basic understanding of the Takings Clause, which has not been understood to be a substantive or absolute limit on the government's power to act. The Clause operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge. The Clause presupposes what the government intends to do is otherwise constitutional:

> "As its language indicates, and as the Court has frequently noted, [the Takings Clause] does not prohibit the taking of private property, but instead places a condition on the exercise of that power. This basic understanding of the Amendment makes clear that it is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles,* 482 U. S. 304, 314–315 (1987) (emphasis and citations omitted).

Given that the constitutionality of the Coal Act appears to turn on the legitimacy of Congress' judgment rather than on the availability of compensation, see *ante,* at 521 ("[I]n a case such as this one, it cannot be said that monetary relief against the Government is an available remedy"), the more appropriate constitutional analysis arises under general due process principles rather than under the Takings Clause.

It should be acknowledged that there are passages in some of our cases on the imposition of retroactive liability for an employer's withdrawal from a pension plan which might give some support to the plurality's discussion of the Takings Clause. See *Connolly* v. *Pension Benefit Guaranty Corpo-*

_ration_, 475 U. S. 211, 223 (1986); _Concrete Pipe & Products of Cal., Inc._ v. _Construction Laborers Pension Trust for Southern Cal._, 508 U. S. 602, 641 (1993). In _Connolly_, the Court said the definition of a taking was not controlled by "any set formula," but was dependent "on ad hoc, factual inquiries into the circumstances of each particular case." 475 U. S., at 224. The Court then applied the three-factor regulatory takings analysis set forth in _Penn Central_, which examines the economic impact of the regulation, the extent to which it interferes with investment-backed expectations, and the character of the governmental action. 475 U. S., at 225. This analysis did not result in a finding of a taking. The Court, moreover, prefaced the entire takings discussion with the admonition it would be surprising to discover that there had been a taking in the instance where a due process attack had been rejected. See _id._, at 223; see also _Concrete Pipe, supra_, at 641 ("Given that [the] due process arguments are unavailing, 'it would be surprising indeed to discover' the challenged statute nonetheless violating the Takings Clause") (quoting _Connolly, supra_, at 223). At best, _Connolly_ is equivocal on the question whether we should apply the regulatory takings analysis to instances like the one now before us. My reading of _Connolly_, and _Concrete Pipe_, is that we should proceed first to general due process principles, reserving takings analysis for cases where the governmental action is otherwise permissible. See _Connolly, supra_, at 224 ("[H]ere, the United States has taken nothing for its own use, and only has nullified a contractual provision limiting liability by imposing an additional obligation that is otherwise within the power of Congress to impose"); see also _Duke Power Co._ v. _Carolina Environmental Study Group, Inc._, 438 U. S. 59, 94, n. 39 (1978) (upholding on due process grounds the Price-Anderson Act, 42 U. S. C. § 2210 (1970 ed., Supp. V), which placed a cap on civil liability for nuclear accidents, but declining to address petitioner's request that the Act be declared a taking because compensation would be available under the Tucker Act, 28 U. S. C. § 1491(a)(1) (1976

ed.)). These authorities confirm my view that the case is controlled not by the Takings Clause but by well-settled due process principles respecting retroactive laws.

Given my view that the takings analysis is inapplicable in this case, it is unnecessary to comment upon the plurality's effort to resolve a jurisdictional question despite little briefing by the parties on a point which has divided the Courts of Appeals.

## II

When the constitutionality of the Coal Act is tested under the Due Process Clause, it must be invalidated. Accepted principles forbidding retroactive legislation of this type are sufficient to dispose of the case.

Although we have been hesitant to subject economic legislation to due process scrutiny as a general matter, the Court has given careful consideration to due process challenges to legislation with retroactive effects. As today's plurality opinion notes, for centuries our law has harbored a singular distrust of retroactive statutes. *Ante*, at 532–533. In the words of Chancellor Kent: "A retroactive statute would partake in its character of the mischiefs of an *ex post facto* law . . . ; and in every other case relating to contracts or property, it would be against every sound principle." 1 J. Kent, Commentaries on American Law *455; see also *ibid.* (rule against retroactive application of statutes to be "founded not only in English law, but on the principles of general jurisprudence"). Justice Story reached a similar conclusion: "Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." 2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891).

The Court's due process jurisprudence reflects this distrust. For example, in *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976), the Court held due process requires an inquiry into whether in enacting the retroactive law the legislature acted in an arbitrary and irrational way. Even though prospective economic legislation carries with it

the presumption of constitutionality, "[i]t does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retrospective aspects of [economic] legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Id.*, at 16–17. We have repeated this formulation in numerous recent decisions and given serious consideration to retroactivity-based due process challenges, all without questioning the validity of the underlying due process principle. *United States v. Carlton,* 512 U. S. 26, 31 (1994); *Concrete Pipe, supra,* at 636–641; *General Motors Corp. v. Romein,* 503 U. S. 181, 191 (1992); *United States v. Sperry Corp.,* 493 U. S. 52, 64 (1989); *United States v. Hemme,* 476 U. S. 558, 567–572 (1986); *Pension Benefit Guaranty Corporation v. R. A. Gray & Co.,* 467 U. S. 717, 729–730 (1984). These decisions treat due process challenges based on the retroactive character of the statutes in question as serious and meritorious, thus confirming the vitality of our legal tradition's disfavor of retroactive economic legislation. Indeed, it is no accident that the primary retroactivity precedents upon which today's plurality opinion relies in its takings analysis were grounded in due process. *Ante,* at 524–528 (citing *Turner Elkhorn, R. A. Gray,* and *Concrete Pipe*).

These cases reflect our recognition that retroactive lawmaking is a particular concern for the courts because of the legislative "tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals." *Landgraf v. USI Film Products,* 511 U. S. 244, 266 (1994); see also Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 693 (1960) (a retroactive law "may be passed with an exact knowledge of who will benefit from it"). If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership.

As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them. Both stability of investment and confidence in the constitutional system, then, are secured by due process restrictions against severe retroactive legislation.

The case before us represents one of the rare instances where the Legislature has exceeded the limits imposed by due process. The plurality opinion demonstrates in convincing fashion that the remedy created by the Coal Act bears no legitimate relation to the interest which the Government asserts in support of the statute. *Ante*, at 529–537. In our tradition, the degree of retroactive effect is a significant determinant in the constitutionality of a statute. *United States* v. *Carlton, supra*, at 32; *United States* v. *Darusmont*, 449 U. S. 292, 296–297 (1981) *(per curiam)*; see also *Dunbar* v. *Boston & P. R. Corp.*, 181 Mass. 383, 386, 63 N. E. 916, 917 (1902) (Holmes, C. J.). As the plurality explains today, in creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope. *Ante*, at 532.

While we have upheld the imposition of liability on former employers based on past employment relationships, the statutes at issue were remedial, designed to impose an "actual, measurable cost of [the employer's] business" which the employer had been able to avoid in the past. *Turner Elkhorn, supra*, at 19; accord, *Concrete Pipe*, 508 U. S., at 638; *Romein, supra*, at 191–192; *R. A. Gray, supra*, at 733–734. As Chancellor Kent noted: "Such statutes have been held valid when clearly just and reasonable, and conducive to the general welfare, even though they might operate in a degree upon existing rights." 1 Kent, Commentaries on American Law, at *455–*456. The Coal Act, however, does not serve

this purpose. Eastern was once in the coal business and employed many of the beneficiaries, but it was not responsible for their expectation of lifetime health benefits or for the perilous financial condition of the 1950 and 1974 plans which put the benefits in jeopardy. As the plurality opinion discusses in detail, the expectation was created by promises and agreements made long after Eastern left the coal business. Eastern was not responsible for the resulting chaos in the funding mechanism caused by other coal companies leaving the framework of the National Bituminous Coal Wage Agreement. *Ante,* at 535–536. This case is far outside the bounds of retroactivity permissible under our law.

Finding a due process violation in this case is consistent with the principle that "under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe, supra,* at 639 (citing *Turner Elkhorn,* 428 U. S., at 19). Statutes may be invalidated on due process grounds only under the most egregious of circumstances. This case represents one of the rare instances in which even such a permissive standard has been violated.

Application of the Coal Act to Eastern would violate the proper bounds of settled due process principles, and I concur in the plurality's conclusion that the judgment of the Court of Appeals must be reversed.

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Some appellate judges are better historians than others. With respect to the central issue resolved by the Coal Act of 1992, I am persuaded that the consensus among the Circuit Judges who have appraised the issue is more accurate than the views of this Court's majority.[1]  The uneasy truce

---

[1] See *ante,* at 535–536 (plurality opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and SCALIA and THOMAS, JJ.); *ante,* at 539, 549 and this page (KENNEDY, J., concurring in judgment and dissenting in part).

between the coal operators and the miners that enabled coal production to continue during the 1950's and 1960's depended more on the value of a handshake than the fine print in written documents. During that period there was an implicit understanding on both sides of the bargaining table that the operators would provide the miners with lifetime health benefits. It was this understanding that kept the mines in operation and enabled Eastern to earn handsome profits before it transferred its coal business to a wholly owned subsidiary in 1965.

My understanding of this critical fact is shared by the judges of the Seventh Circuit,[2] the Sixth Circuit,[3] and the

---

[2] "[E]very [National Bituminous Coal Wage Agreement (NBCWA)] signatory company shared some responsibility in creating a legitimate expectation among miners of lifetime health benefits. Imposing liability on companies that have profited from the retirees' labor was found rational in [*Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 18 (1976)] . . . . Every signatory company, including plaintiffs, participated in the creation and development of a multi-employer health benefit program that provided lifetime health benefits for retirees for almost fifty years. Congress could rationally have concluded that such participation led to a legitimate expectation of lifetime health benefits that should be honored under the Coal Act. Again, in this light, it would have been arbitrary to draw the line anywhere other than at all NBCWA signatories. Plaintiffs respond that it was not until the 1974 NBCWA and the 'guarantee' and 'evergreen' clauses of the 1978 NBCWA that miners were promised lifetime health benefits—promises that plaintiffs never made. Therefore, they argue, it was irrational for Congress to require contributions from pre-1974 signatories. But the fact that plaintiffs never contractually agreed to provide lifetime benefits does not rebut the rationality of finding that they contributed to the expectation of lifetime benefits. The Coal Commission and Congress found that the promise of lifetime benefits dates back to the 1940s, even though it is not explicit in any NBCWA until 1974." *Davon, Inc.* v. *Shalala*, 75 F. 3d 1114, 1124–1125 (1996) (footnote omitted).

[3] "Blue Diamond further argues that it was irrational for Congress to impose Coal Act liability upon Blue Diamond because Blue Diamond did not promise its employees that they would receive lifetime health benefits. It is undisputed that the NBCWAs did not contain an explicit promise of lifetime benefits until the 1974 NBCWA agreement. However, several federal courts have found that [United Mine Workers of America (UMWA)] members had a legitimate expectation of lifetime benefits be-

First Circuit.[4]  It is the same understanding that motivated the members of the Coal Commission to conclude that the operators who had employed the "orphaned miners" should share responsibility for their health benefits.[5]  And it is

fore the 1974 NBCWA, based on the various funds' more than 30-year history of continuous payment of benefits and the statements of coal industry officials.  *Davon,* 75 F. 3d at 1124–25 ('Congress could rationally have concluded that such participation [in the NBCWA benefit funds] led to a legitimate expectation of lifetime benefits.').  *See also Templeton Coal [Co., Inc.* v. *Shalala,* 882 F. Supp. 799, 825 (SD Ind. 1995)] (describing basis for lifetime benefits expectation).  Congress certainly had a rational basis for concluding that all NBCWA signatories and 'me-too' operators who agreed to be bound by the NBCWAs, including Blue Diamond, contributed toward the legitimate expectations of the UMWA members."  *In re Blue Diamond Coal Co.,* 79 F. 3d 516, 522 (1996).

[4] "[I]t is not accurate to claim that only those [signatory operators] which executed NBCWAs in or after 1974 created a legitimate expectation of lifetime health benefits for miners.  Congress and the Coal Commission both reviewed the historical evidence and concluded that pre-1974 signatories had made an *implicit* commitment to furnish such benefits. . . .

"Of course, the appellant is correct in insisting that the commitment distilled by Congress from the historical data was not made explicit in the text of those NBCWAs which were written before 1974.  But Eastern reads too much into that omission.  To be sure, such an implied commitment might not be enforceable in a civil suit *ex contractu*—but this is a constitutional challenge, not a breach of contract case.  For purposes of due process review, Congress' determination that a commitment was made need not rest upon a legally enforceable promise; it is enough that Congress' conclusions as to the existence and effects of such a commitment are rational."  *Eastern Enterprises* v. *Chater,* 110 F. 3d 150, 157 (1997).

[5] "The Commission firmly believes that the retired miners are entitled to the health care benefits that were promised and guaranteed them and that such commitments must be honored. . . .

.           .           .           .           .

"Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years.  That commitment should be honored.  But today those expectations and commitments are in jeopardy."  Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report (1990), quoted in App. 237a, 245a–246a.

the same understanding that led legislators in both political parties to conclude that the Coal Act of 1992 represented a fair solution to a difficult problem.

Given the critical importance of the reasonable expectations of both the miners and the operators during the period before their implicit agreement was made explicit in 1974, I am unable to agree with the plurality's conclusion that the retroactive application of the 1992 Act is an unconstitutional "taking" of Eastern's property. Rather, it seems to me that the plurality and JUSTICE KENNEDY have substituted their judgment about what is fair for the better informed judgment of the members of the Coal Commission and Congress.[6]

Accordingly, I conclude that, whether the provision in question is analyzed under the Takings Clause or the Due Process Clause, Eastern has not carried its burden of overcoming the presumption of constitutionality accorded to an Act of Congress, by demonstrating that the provision is unsupported by the reasonable expectations of the parties in interest.

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

We must decide whether it is fundamentally unfair for Congress to require Eastern Enterprises to pay the health care costs of retired miners who worked for Eastern before 1965, when Eastern stopped mining coal. For many years Eastern benefited from the labor of those miners. Eastern helped to create conditions that led the miners to expect continued health care benefits for themselves and their families

---

[6] It may well be true that the majority might have been able to fashion a wiser solution to a difficult problem. Nevertheless, as Chief Justice Hughes observed in a dissent joined by Justices Brandeis, Stone, and Cardozo: "The power committed to Congress to govern interstate commerce does not require that its government should be wise, much less that it should be perfect." *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 391–392 (1935).

after they retired. And Eastern, until 1987, continued to draw sizable profits from the coal industry through a wholly owned subsidiary. For these reasons, I believe that Congress did not act unreasonably or otherwise unjustly in imposing these health care costs upon Eastern. Consequently, in my view, the statute before us is constitutional.

I

As a preliminary matter, I agree with JUSTICE KENNEDY, *ante*, at 539–547 (opinion concurring in judgment and dissenting in part), that the plurality views this case through the wrong legal lens. The Constitution's Takings Clause does not apply. That Clause refers to the taking of "private property . . . for public use, without just compensation." U. S. Const., Amdt. 5. As this language suggests, at the heart of the Clause lies a concern, not with preventing arbitrary or unfair government action, but with providing *compensation* for legitimate government action that takes "private property" to serve the "public" good.

The "private property" upon which the Clause traditionally has focused is a specific interest in physical or intellectual property. See, *e. g., Penn Central Transp. Co.* v. *New York City*, 438 U. S. 104, 124 (1978); *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986 (1984). It requires compensation when the government takes that property for a public purpose. See *Dolan* v. *City of Tigard*, 512 U. S. 374, 384 (1994) (Clause requires payment so that government cannot "'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole'" (quoting *Armstrong* v. *United States*, 364 U. S. 40, 49 (1960))). This case involves not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties.

This Court has not directly held that the Takings Clause applies to the creation of this kind of liability. The Court has made clear that not only seizures through eminent do-

main but also certain "takings" through regulation can require "compensation" under the Clause. See, *e. g., Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922) ("[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking"); *Lucas* v. *South Carolina Coastal Council,* 505 U. S. 1003 (1992) (land-use regulation that deprives owner of all economically beneficial use of property constitutes taking); *Nollan* v. *California Coastal Comm'n,* 483 U. S. 825 (1987) (public easement across property may constitute taking). But these precedents concern the taking of interests in *physical* property.

The Court has also made clear that the Clause can apply to monetary interest generated from a fund into which a private individual has paid money. *Webb's Fabulous Pharmacies, Inc.* v. *Beckwith,* 449 U. S. 155 (1980). But the monetary interest at issue there arose out of the operation of a specific, separately identifiable fund of money. And the government took that interest for itself. Here there is no specific fund of money; there is only a general liability; and that liability runs not to the Government, but to third parties. Cf., *e. g., Armstrong, supra,* at 48 (Government destroyed liens "for its own advantage"); *Connolly* v. *Pension Benefit Guaranty Corporation,* 475 U. S. 211, 225 (1986) (no taking where "the Government does not physically invade or permanently appropriate any . . . assets *for its own use*" (emphasis added)).

The Court in two cases has arguably acted *as if* the Takings Clause might apply to the creation of a general liability. *Connolly, supra; Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.,* 508 U. S. 602 (1993). But in the first of those cases, the Court said that the Takings Clause had *not* been violated, in part because "the Government does not physically invade or permanently appropriate any . . . assets for its own use." *Connolly,* 475 U. S., at 225. It also rejected the position that a

taking occurs "whenever legislation requires one person to use his or her assets for the benefit of another." *Id.*, at 223. The second case basically followed the analysis of the first case. *Concrete Pipe*, 508 U. S., at 641–647. And both cases *rejected* the claim of a Takings Clause violation. *Id.*, at 646–647; *Connolly, supra*, at 227–228.

The dearth of Takings Clause authority is not surprising, for application of the Takings Clause here bristles with conceptual difficulties. If the Clause applies when the government simply orders A to pay B, why does it not apply when the government simply orders A to pay the government, *i. e.*, when it assesses a tax? Cf. *In re Leckie Smokeless Coal Co.*, 99 F. 3d 573, 583 (CA4 1996) (characterizing "reachback" liability payments as a "tax"), cert. denied, 520 U. S. 1118 (1997); *In re Chateaugay Corp.*, 53 F. 3d 478, 498 (CA2 1995) (same), cert. denied *sub nom. LTV Steel Co., Inc.* v. *Shalala*, 516 U. S. 913 (1995). Would that Clause apply to some or to all statutes and rules that "routinely creat[e] burdens for some that directly benefit others"? *Connolly, supra*, at 223. Regardless, could a court apply the same kind of Takings Clause analysis when violation means the law's invalidation, rather than simply the payment of "compensation?" See *First English Evangelical Lutheran Church of Glendale* v. *County of Los Angeles*, 482 U. S. 304, 315 (1987) ("[The Takings Clause] is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking").

We need not face these difficulties, however, for there is no need to torture the Takings Clause to fit this case. The question involved—the potential unfairness of retroactive liability—finds a natural home in the Due Process Clause, a Fifth Amendment neighbor. That Clause says that no person shall be "deprive[d] . . . of life, liberty, or property, without due process of law." U. S. Const., Amdt. 14, §1. It safeguards citizens from arbitrary or irrational legislation.

And the Due Process Clause can offer protection against legislation that is unfairly retroactive at least as readily as the Takings Clause might, for as courts have sometimes suggested, a law that is fundamentally unfair because of its retroactivity is a law that is basically arbitrary. See, *e. g., Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U. S. 717, 728–730 (1984); *id.*, at 730 ("[R]etroactive aspects of legislation [imposing withdrawal liability on employers participating in pension plan] must meet the test of due process"); *id.*, at 733 ("[R]etrospective civil legislation may offend due process if it is particularly harsh and oppressive" (internal quotation marks omitted)); *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 17 (1976). Cf. *United States* v. *Carlton*, 512 U. S. 26, 30 (1994) (retroactive tax provision); *Welch* v. *Henry*, 305 U. S. 134, 147 (1938) (same); *National Labor Relations Board* v. *Guy F. Atkinson Co.*, 195 F. 2d 141, 149, 151 (CA9 1952) (invalidating administrative order as "arbitrary, capricious, an abuse of discretion," see 5 U. S. C. § 706(2)(A), because "[t]he inequity of . . . retroactive policy making . . . is the sort of thing our system of law abhors").

Nor does application of the Due Process Clause automatically trigger the Takings Clause, just because the word "property" appears in both. That word appears in the midst of different phrases with somewhat different objectives, thereby permitting differences in the way in which the term is interpreted. Compare, *e. g., United States* v. *Martin Linen Supply Co.*, 430 U. S. 564 (1977) ("person" includes corporations for purposes of Fifth Amendment Double Jeopardy Clause), with *Doe* v. *United States*, 487 U. S. 201, 206 (1988) ("person" does not include a corporation for purposes of Fifth Amendment Self-Incrimination Clause).

Insofar as the plurality avoids reliance upon the Due Process Clause for fear of resurrecting *Lochner* v. *New York*, 198 U. S. 45 (1905), and related doctrines of "substantive due process," that fear is misplaced. Cf. *id.*, at 75–76 (Holmes, J., dissenting); *Lincoln Fed. Union* v. *Northwestern*

*Iron & Metal Co.*, 335 U. S. 525, 535 (1949) (repudiating the "*Allgeyer-Lochner-Adair-Coppage* constitutional doctrine"). As the plurality points out, *ante*, at 533, an unfair retroactive assessment of liability upsets settled expectations, and it thereby undermines a basic objective of law itself. See, *e. g.*, 2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891) (criticizing retrospective laws as failing to "accord with . . . the fundamental principles of the social compact"); *ibid.* (retroactive legislation invalid "upon principles derived from the general nature of free governments, and the necessary limitations created thereby"); *General Motors Corp.* v. *Romein*, 503 U. S. 181, 191 (1992) ("Retroactive legislation . . . can deprive citizens of legitimate expectations"); *Fletcher* v. *Peck*, 6 Cranch 87, 143 (1810) (Johnson, J., concurring) (suggesting that retroactive legislation is invalid because it offends principles of natural law).

To find that the Due Process Clause protects against this kind of fundamental unfairness—that it protects against an unfair allocation of public burdens through this kind of specially arbitrary retroactive means—is to read the Clause in light of a basic purpose: the *fair application of law,* which purpose hearkens back to the Magna Carta. It is not to resurrect long-discredited substantive notions of "freedom of contract." See, *e. g., Ferguson* v. *Skrupa,* 372 U. S. 726, 729–732 (1963).

Thus, like the plurality I would inquire if the law before us is fundamentally unfair or unjust. *Ante*, at 534–537. But I would ask this question because, like JUSTICE KENNEDY, I believe that, *if so,* the Coal Act would "deprive" Eastern of "property, without due process of law." U. S. Const., Amdt. 14, § 1.

II

The substantive question before us is whether or not it is fundamentally unfair to require Eastern to make *future* payments for health care costs of retired miners and their families, on the basis of Eastern's *past* association with these

miners. Congress might have assessed all those who now use coal, or the taxpayer, in order to pay for those retired coal miners' health benefits. But Congress, instead, imposed this liability on Eastern. Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), 26 U. S. C. §§ 9701–9722 (1994 ed. and Supp. II). The "fairness" question is, why Eastern?

The answer cannot lie in a contractual promise to pay, for Eastern made no such contractual promise. Nor did Eastern participate in any benefit plan that made such a contractual promise, prior to its departure from the coal industry in 1965. But, as JUSTICE STEVENS points out, this case is not a civil law suit for breach of contract. It is a constitutional challenge to Congress' decision to assess a new future liability on the basis of an old employment relationship. *Ante*, at 551–552, n. 3 (dissenting opinion). Unless it is fundamentally unfair and unjust, in terms of Eastern's reasonable reliance and settled expectations, to impose that liability, the Coal Act's "reachback" provision meets that challenge. See *Connolly,* 475 U. S., at 227; *Concrete Pipe,* 508 U. S., at 645–646.

I believe several features of this case demonstrate that the relationship between Eastern and the payments demanded by the Coal Act is special enough to pass the Constitution's fundamental fairness test. That is, even though Eastern left the coal industry in 1965, the historical circumstances, taken together, prevent Eastern from showing that the Coal Act's "reachback" liability provision so frustrates Eastern's reasonable settled expectations as to impose an unconstitutional liability. Cf. *Penn Central,* 438 U. S., at 127–128.

For one thing, the liability that the statute imposes upon Eastern extends only to miners whom Eastern itself employed. See 26 U. S. C. § 9706(a) (imposing "reachback" liability only where no presently operating coal firm which ratified 1978 or subsequent bargaining agreement ever employed the retiree, and Eastern employed the retiree longer than

any other "reachback" firm). They are miners whose labor benefited Eastern when they were younger and healthier. Insofar as working conditions created a risk of future health problems for those miners, Eastern created those conditions. And these factors help to distinguish Eastern from others with respect to a later obligation to pay the health care costs that inevitably arise in old age. See, e. g., 138 Cong. Rec. 34001 (1992) (Conference Report on Coal Act) (Coal Act assigns liability to "those companies which employed the retirees . . . and thereby benefitted from their services"); Hearings on Provisions Relating to the Health Benefits of Retired Coal Miners before the House Committee on Ways and Means, 103d Cong., 1st Sess., 8–9, 32 (1993) (hereinafter Hearings on Health Benefits); House Committee on Ways and Means, Financing UMWA Coal Miner "Orphan Retiree" Health Benefits, 103d Cong., 1st Sess., 50–51 (Comm. Print 1993) (hereinafter House Report).

Congress has sometimes imposed liability, even "retroactive" liability, designed to prevent degradation of a natural resource, upon those who have used and benefited from it. See, e. g., Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U. S. C. § 9601 et seq. (1994 ed. and Supp. I). That analogy, while imperfect, calls attention to the special tie between a firm and its former employee, a human resource, that helps to explain the special retroactive liability. That connection, while not by itself justifying retroactive liability here, helps to distinguish a firm like Eastern, which employed a miner but no longer makes coal, from other funding sources, say, current coal producers or coal consumers, who now make or use coal but who have never employed that miner or benefited from his work.

More importantly, the record demonstrates that Eastern, before 1965, contributed to the making of an important "promise" to the miners. That "promise," even if not contractually enforceable, led the miners to "develo[p]" a reasonable "expectation" that they would continue to receive

"[retiree] medical benefits." *Ante*, at 535. The relevant history, outlined below, shows that industry action (including action by Eastern), combined with Federal Government action and the miners' own forbearance, produced circumstances that made it natural for the miners to believe that either industry or Government (or both) would make every effort to see that they received health benefits after they retired—regardless of what terms were explicitly included in previously signed bargaining agreements.

(1) Before the 1940's, health care for miners, insofar as it existed, was provided by "company doctors" in company towns. See, *e. g.*, U. S. Dept. of Interior, Report of the Coal Mines Administration, A Medical Survey of the Bituminous-Coal Industry 121, 144 (1947) (hereinafter Boone Report); *id.*, at 131, 191, 193 (describing care as substandard and criticizing the "noticeable deficiency" in the number of doctors); Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits, Coal Commission Report 19 (1990) (hereinafter Coal Comm'n Report), App. in No. 96–1947 (CA1), p. 1350 (hereinafter App. (CA1)). By the late 1940's, health care and pension rights had become *the* issue for miners, a central demand in collective bargaining, and a rallying cry for those who urged a nationwide coal strike. M. Fox, United We Stand 404, 416 (1990); I. Krajcinovic, From Company Doctors to Managed Care 17, 43 (1997) (hereinafter Krajcinovic); C. Seltzer, Fire in the Hole 57 (1985); R. Zieger, John L. Lewis: Labor Leader 151 (1988); see also *ante*, at 504–505. John L. Lewis, head of the United Mine Workers of America (hereinafter UMWA or Union), urged the mine owners to "'remove that fear'" of sudden death from "'their minds so that they will know if that occurs . . . their families will be provided with proper insurance.'" Zieger, *supra*, at 153. In 1946, the workers struck. The Government seized the mines. And the Government, together with the Union, effectively imposed a managed health care agreement on the coal operators. Seltzer, *supra*, at 58.

562

(2) The resulting 1946 "Krug-Lewis Agreement" created a Medical and Hospital Fund designed to "provide, or to arrange for the availability of, medical, hospital, and related services for the miners and their dependents." Krug-Lewis Agreement § 4(b), App. (CA1) 612–613. One year later, this fund was consolidated with a "Welfare and Retirement Fund" also established in 1946 (hereinafter W&R Fund). 1947 National Bituminous Coal Wage Agreement (hereinafter NBCWA) 150, App. (CA1) 621. Under the 1947 and successive agreements, the W&R Fund's three trustees (union, management, and "neutral") determined the specific benefits provided under the plan. 1947 NBCWA 144, App. (CA1) 618.

(3) Between 1947 and 1965, the benefits that the W&R Fund provided included retiree benefits quite similar to those at issue here. The bargaining agreements between the coal operators and miners (NBCWA's) and the W&R Fund's Annual Reports make clear that the W&R Fund provided benefits to all "employees . . . , their families and dependents for medical or hospital care." 1947 NBCWA 146, App. (CA1) 619; 1950 NBCWA 60–61, App. (CA1) 639 (continuing coverage); 1951 NBCWA 50–51, App. (CA1) 648 (same); 1952 NBCWA 40–42, App. (CA1) 650–651 (same); 1955 NBCWA 34–35, App. (CA1) 655 (same); 1956 NBCWA 28–29, App. (CA1) 658 (same); 1958 NBCWA 16–17, App. (CA1) 661 (same); 1964 NBCWA 4–5, App. (CA1) 668–669 (same); 1966 NBCWA 4–5, App. (CA1) 688–689 (same). The Fund's Annual Reports specified that eligible family members included miners' spouses, children, dependent parents, and (at least after 1955) *retired miners and their dependents,* and widows and orphans (for a 12-month period). 1955 W&R Fund Annual Report 15, 28, App. (CA1) 881, 894; 1956 W&R Fund Annual Report 13–14, App. (CA1) 912–913 (also noting the "unprecedented magnitude and liberality of the Fund's Hospital and Medical Care Program"); 1958 W&R Fund Annual Report 7, App. (CA1) 943; 1959 W&R Fund Annual Report

7–8, App. (CA1) 975–976; 1960 W&R Fund Annual Report 9, App. (CA1) 1018; 1961 W&R Fund Annual Report 16–17, App. (CA1) 1058–1059; 1962 W&R Fund Annual Report 15–16, App. (CA1) 1090–1091; 1963 W&R Fund Annual Report 15–16, App. (CA1) 1123–1124; 1964 W&R Fund Annual Report 22–23, App. (CA1) 1160–1161; 1965 W&R Fund Annual Report 14, App. (CA1) 1187. See also Hearings on Health Benefits, at 36 (suggesting retirees eligible " 'from the inception of bargained benefits' ").

The only significant difference between the coverage provided before 1974 and after 1974 consists of greater generosity after 1974 with respect to widows, for the earlier 12-month limitation was repealed and health benefits extended to widows' remarriage or death. See 1974 NBCWA 105, App. (CA1) 758.

(4) In return for what the miners thought was an assurance (though not a contractual obligation) from management of continued pension and health care benefits, the Union agreed to accept mechanization of mining, a concession that meant significant layoffs and a smaller future work force. Coal Comm'n Report 11–14, App. (CA1) 1342–1345 (75% decline in employment from 1950 to 1969); Krajcinovic 4, 43–44; Seltzer, *supra*, at 36; see also C. Perry, Collective Bargaining and the Decline of the United Mine Workers 43 (1984) (detailing benefits of mechanization for coal operators). The president of the Southern Coal Operators' Association said in 1953 that the miners "have been promised and grown accustomed to" health benefits. App. (CA1) 2000. Those benefits, the management's W&R Fund trustee said in 1951, covered "mine worker[s], including pensioners, and dependents . . . without limit as to duration." *Id.*, at 1972. This Court, too, has said that the UMWA "agreed not to oppose the rapid mechanization of the mines" in exchange for "increased wages" and "payments into the welfare fund." *Mine Workers* v. *Pennington*, 381 U. S. 657, 660 (1965); see also *id.*, at 698 (Goldberg, J., concurring in judgment) (improved wages,

benefits, and working conditions were a *"quid pro quo"* for automation).

Others have reached similar conclusions. The Coal Commission more recently said:

> "Retired coal miners have legitimate expectations of health care benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years. That commitment should be honored." Coal Comm'n Report 1, App. (CA1) 1332.

And numerous supporters of the present law read the history as showing, for example, that the "miners went to work each day under the assumption that their health benefits would be there when they retired." 138 Cong. Rec. 20121 (1992) (Sen. Wofford); see also *id.*, at 20118 (Sen. Rockefeller) (Coal Act "will see to it that the promise of health care is kept to tens of thousands of retired coal miners and their families"); *id.*, at 20119 (Sen. Byrd) (Coal Act will "assure . . . retired coal miners . . . that promises made to them during their working years are not now . . . reneged upon"); *id.*, at 20120 (Sen. Ford) (Coal Act assures that "promise made to [retirees] can be kept"); *id.*, at 34001 (Conference Report on Coal Act) ("Under [NBCWA's], retirees and their dependents have been promised lifetime health care benefits").

Further, the Federal Government played a significant role in developing the expectations that these "promises" created. In 1946, as mentioned above, during a strike related to health and pension benefits, the Government seized the mines and imposed the "Krug-Lewis Agreement," which established the basic health benefits framework. *Supra,* at 561; see also 11 Fed. Reg. 5593 (1946) (President Truman's seizure order). In 1948, during a strike related to pension benefits, the Government again intervened to ensure continued availability of these benefits. 13 Fed. Reg. 1579 (1948) (Executive Order creating board to inquire into strike); Kraj-

cinovic 37–38.   In later years, but before 1965, Congress provided the W&R Fund with special tax benefits, helped the Fund to build hospitals, and established health and safety standards.   Brief for Respondents UMWA Combined Benefit Fund et al. 11–12 (citing relevant statutes and record materials).   This kind of Government intervention explains why the president of the Southern Coal Producers' Association said, in the 1950's, that if benefits were reduced, it was

> "entirely conceivable that Congress [would] step in and take over the mines, assuming responsibility for the welfare collections and payment."   App. (CA1) 2000.

I repeat that the Federal Government's words and deeds, along with those of the pre-1965 industry, did not necessarily create contractually binding promises (which, had they existed, might have eliminated the need for this legislation). But in labor relations, as in human relations, one can create promises and understandings which, even in the absence of a legally enforceable contract, others reasonably expect will be honored.   Indeed, in labor relations such industrywide understandings may spell the difference between labor war and labor peace, for the parties may look to a strike, not to a court, for enforcement.   It is that kind of important, mutual understanding that is at issue here.   For the record shows that pre-1965 statements and other conduct led management to understand, and labor legitimately to expect, that health care benefits for retirees and their dependents would continue to be provided.

Finally, Eastern continued to obtain profits from the coal mining industry long after 1965, for it operated a wholly owned coal-mining subsidiary, Eastern Associated Coal Corp. (hereinafter EACC), until the late 1980's.   Between 1966 and 1987, Eastern effectively ran EACC, sharing officers, supervising management, and receiving 100% of EACC's approximately $100 million in dividends.   Brief for Petitioner 6, n. 13; App. (CA1) 2172 (affidavit of T. Gallagher,

EACC General Counsel); *id.*, at 2182 (Eastern Corporate Cash Manual); see also *id.*, at 2170–2173 (noting Eastern's profits from, and control over, EACC); *id.*, at 2178–2181; *id.*, at 2192–2205. Eastern officials, in their role as EACC directors, ratified the post-1965 bargaining agreements, Brief for Bituminous Coal Operators' Association, Inc., as *Amicus Curiae* 28, and n. 20; Brief for Respondent Peabody Holding Co., Inc., et al. 14–15, and must have remained aware of the W&R Fund's deepening financial crisis.

Taken together, these circumstances explain why it is not fundamentally unfair for Congress to impose upon Eastern liability for the future health care costs of miners whom it long ago employed—rather than imposing that liability, for example, upon the present industry, coal consumers, or taxpayers. Each diminishes the reasonableness of Eastern's expectation that, by leaving the industry, it could fall within the Constitution's protection against unfairly retroactive liability.

These circumstances, as elaborated by the record, mean that Eastern knew of the potential funding problems that arise in any multiemployer benefit plan, see *Concrete Pipe,* 508 U. S., at 637–639, before it left the industry. Eastern knew or should have known that, in light of the structure of the benefit plan and the frequency with which coal operators went out of business, a "last man out" problem could exacerbate the health plan's funding difficulties. See, *e. g.,* Boone Report xvi; House Report 34; Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing before the Subcommittee on Medicare and Long-Term Care of the Senate Committee on Finance, 102d Cong., 1st Sess., 15, 21 (1991) (statement of Coal Commission Vice Chairman Henry Perritt, Jr.). Eastern also knew or should have known that because of prior federal involvement, future federal intervention to solve any such problem was a serious possibility. *Supra,* at 564–565; see also *Concrete Pipe, supra,* at 645–646; *Connolly,* 475 U. S., at 226–227; *Usery,* 428 U. S., at 15–16.

Eastern knew, by the very nature of the problem, that any legislative effort to solve such a problem could well occur many years into the future. And, most importantly, Eastern played a significant role in creating the miners' expectations that led to this legislation. Add to these circumstances the two others I have mentioned—that Eastern had benefited from the labor of the miners for whose future health care it must provide, and that Eastern remained in the industry, drawing from it substantial profits (though doing business through a subsidiary, which usually, *but not always*, insulates an owner from liability).

The upshot, if I follow the form of analysis this Court used in *Connolly*, is that I cannot say the Government's regulation has unfairly interfered with Eastern's "distinct investment-backed expectations." See *Connolly*, *supra*, at 225–227 (analyzing "taking" in terms of three factors: (1) "economic impact"; (2) interference "'with distinct investment-backed expectations'"; and (3) "'character of the governmental action'" (citations omitted)). Within that framework, I could find additional support for the constitutionality of the "reach-back" liability provision by adding that the "character of the governmental action" here amounts to the creation of a liability to a third party, and not a direct "taking" of an interest in physical property. And the fact that the statute here narrows Eastern's liability to those whom it employed, while explicitly preserving Eastern's rights to indemnification from others (thereby helping Eastern spread the risk of this liability), 26 U. S. C. § 9706(f)(6), helps to diminish the Coal Act's "economic impact" upon Eastern as well.

I would put the matter more directly, however. The law imposes upon Eastern the burden of showing that the statute, because of its retroactive effect, is fundamentally unfair or unjust. The circumstances I have mentioned convince me that Eastern cannot show a sufficiently reasonable expectation that it would remain free of future health care cost liability for the workers whom it employed. Eastern has

therefore failed to show that the law unfairly upset its legitimately settled expectations. Because, in my view, Eastern has not met its burden, I would uphold the "reachback" provision of the Coal Act as constitutional.