[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2002
THOMAS K. KAHN
CLERK

No. 01-13691

D.C. Docket No. 98-02858-CV-C-S

APOGEE COAL COMPANY,
A.T. MASSEY COAL
COMPANY, INC., et al.,

Plaintiffs-Counter-
Defendants-Appellants,

CENTRAL OHIO COAL
COMPANY,

Plaintiff-Appellant,

versus

MICHAEL H. HOLLAND, trustee of the
UMWA Combined Benefit Fund,
ELLIOT A. SEGAL, trustee of the UMWA
Combined Benefit Fund, et al.,

Defendants-Counter-
Claimants-Appellees,

GALE NORTON, Secretary of
the Department of the Interior,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

**(July 12, 2002)**

Before EDMONDSON, Chief Judge, CARNES and SILER[*], Circuit Judges.

SILER, Circuit Judge:

Plaintiffs, coal operators (the "Operators"), appeal the district court's denial of their motion for summary judgment and its grant of summary judgment to Defendants, fund trustees ("Trustees"). The Operators claim that the Trustees improperly assessed premiums against the Operators in response to the Supreme Court's decision in Eastern Enterprises v. Apfel, 524 U.S. 498 (1998). The United States appears as amicus curiae in favor of the Trustees. For the reasons stated below, we AFFIRM.

**I.**

A. THE ESTABLISHMENT OF THE COMBINED BENEFIT FUND

In 1947, a National Bituminous Coal Wage Agreement ("NBCWA") between coal companies and the United Mine Workers of America ("UMWA") established a benefit fund to provide pension and medical benefits to miners and their dependents.

_____

[*]Honorable Eugene E. Siler, Jr., U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

The fund relied on proceeds from a royalty on coal production, and did not specify particular benefits to which miners were entitled; instead, the NBCWA provided for UMWA-sponsored trustees to determine and alter benefits as the proceeds from this royalty fluctuated. Successive 1950 and 1974 benefit funds expanded traditional coverage by providing for the payment of health care benefits to retired mine workers and their dependents. This change in coverage and other factors – a decline in coal production, the retirement of a generation of miners, and a rapid acceleration in healthcare costs – soon led to financial trouble for the 1950 and 1974 Funds. A 1978 NBCWA intended to address these problems led to further insolvency.

Congress then passed the Coal Industry Retiree Health Benefit Act of 1992 (the "Coal Act" or the "Act"), which merged the 1950 and 1974 Funds into a new multi-employer plan called the UMWA Combined Benefit Fund (the "Combined Fund"). The Combined Fund provides benefits essentially equivalent to those provided under the 1950 and 1974 Funds, and is financed by annual premiums assessed against coal companies that signed any NBCWA or other agreement that obligated them to contribute to the 1950 or 1974 Funds. Under the Act, the Commissioner of Social Security assigns retirees to signatory coal companies according to this formula: first, to the most recent signatory to the 1978 or a subsequent NBCWA to employ the retiree in the coal industry for at least two years; second, to the most recent signatory

3

to the 1978 or a subsequent NBCWA to employ the retiree in the coal industry for any period of time; and third, to the signatory company that employed the retiree in the coal industry for the longest period of time prior to the effective date of the 1978 NBCWA. Retirees that cannot be assigned under any of these three tiers are placed in a pool of "unassigned" beneficiaries.

The annual obligation assessed to each company by the trustees of the Combined Fund (the "Trustees") consists of three parts: a health benefit premium, a death benefit premium, and an unassigned beneficiary premium. See 26 U.S.C. § 9704(a)(1)-(3). The health benefit premium is a set amount multiplied by the total number of beneficiaries assigned to that operator. The death benefit premium is determined by dividing an estimated total death benefit pay-out by the number of assigned retirees, and then billing each company a pro-rata share for each retiree assigned to it. The unassigned beneficiary premium assumes a set amount is paid for each unassigned beneficiary, and then divides the total among signatory companies based on the number of retirees assigned to them.

In order to reduce the premium obligations of signatory companies, the Coal Act provides for a transfer of monies to the Combined Fund from two sources. The first source is the 1950 Fund. The Coal Act directed the 1950 Fund to transfer $210 million to the Combined Fund in three yearly payments of $70 million. See 26 U.S.C.

4

§ 9705(a). The Coal Act required that the first $70 million transfer, made on February 1, 1993, be used to reduce coal operators' health benefit, death benefit, and unassigned beneficiary premium obligations for the 1993 plan year. See 26 U.S.C. §§ 9704(a), 9705(a)(3)(A). Following the Act, the Trustees applied the payment first to premiums for unassigned beneficiaries ($38.5 million) and then death benefit premiums ($8.9 million), leaving $22.6 million to be applied to reduce assigned beneficiary health benefit premiums (from $1,504.71 per retiree to $1,232.78).

The remaining two transfers were applied to plan years 1994 and 1995. Following the Coal Act, these payments were applied first to unassigned beneficiary premiums and then to death benefit premiums; they could not be applied to assigned beneficiary premiums. The remainder from the second and third transfers was set aside for use against death benefit premiums in future plan years.

After these payments, a second source of funds was introduced to offset premiums: the Abandoned Mine Land Reclamation Fund (the "AML Fund"), managed by the Department of the Interior. Beginning with plan year 1996, § 402 of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA") provides for an annual transfer of interest earned on the corpus of the AML Fund to cover expenditures made from the Combined Fund for unassigned beneficiaries in that plan

5

year.  See 30 U.S.C. § 1232(h); see also 26 U.S.C. § 9705(b).  Interest from the AML Fund entirely covered premiums for unassigned beneficiaries in plan years 1996-98.

B.  THE EASTERN DECISION

In June 1998, the Supreme Court considered the claims of coal company Eastern Enterprises ("Eastern"), which exited the industry in 1965 and argued that the Social Security Administration's ("SSA's") retroactive assessment of premiums against it under the third tier of the Coal Act's allocation scheme constituted a taking and violated the Fifth Amendment.  See E. Entrprs. v. Apfel, 524 U.S. 498 (1998). The Court agreed with Eastern and declared this third tier invalid as applied to it.  See id. at 537.

In September 1998, the SSA voided all beneficiary assignments previously made to Eastern and more than 100 similarly-situated companies.  This resulted in 8,119 beneficiaries, who had been assigned at the start of the 1998 plan year and in past plan years, being redesignated as unassigned beneficiaries for all plan years.

Upon receiving notice of this change, the Trustees refunded all of the premiums that companies excused by Eastern had paid over the years.  They then retroactively recalculated the premiums of the remaining companies from 1993, the first plan year, to the present, as though the former Eastern beneficiaries had been considered unassigned beneficiaries from the outset.  As part of this recalculation, the Trustees

6

reapplied the past payments from the 1950 Fund and the AML Fund to these new premium assessments. Under this method, more of the 1950 Fund payments were used to cover unassigned beneficiary premiums, and less money could be set aside to cover death benefit premiums in plan years 1997-99. The Trustees therefore assigned, for the first time, a death benefit premium for plan year 1999 and retroactive death benefit premiums for plan years 1997 and 1998. In total, these recalculations resulted in an additional $21 million in premium liability for the remaining operators.

The Operators, all coal companies still subject to the Coal Act, then filed this action in district court against the Trustees. They filed a motion for summary judgment challenging the Trustees' retroactive recalculation of premium assessments against them. The Secretary of the Interior filed an *amicus curiae* brief in support of the Trustees. The district court denied the Operators' motion for summary judgment and granted summary judgment to the Trustees. The Operators appeal that decision to this court. This court reviews a district court's grant of summary judgment *de novo*. See Clark v. Coates & Clark, Inc., 990 F.2d 1217, 1222 (11th Cir. 1993).

**II.**

The parties agree that the Trustees acted properly in refunding the payments made based on assignments the Supreme Court found invalid in Eastern. The sole issue is whether the Trustees acted properly in retroactively recalculating operators'

7

premiums in response to Eastern. In truth, this is a fight about the extent to which the AML Fund may be used to compensate the Combined Fund for losses resulting from the Eastern refund. The Trustees, applying their retroactive recalculation method, asked the AML Fund to compensate only some of this refund; the Operators want the Fund to reimburse the entire refund amount and rely on a different accounting method. Accordingly, they contend that the Trustees' retroactive reassessment of premiums in response to Eastern was improper.

Section 402(h) of the SMCRA governs when AML Fund monies may be used to reimburse expenditures from the Combined Fund. Section 402(h)(2) requires that a yearly transfer be made from the AML Fund to the Combined Fund equivalent to the interest earned on the Fund in that year or $70 million, whichever is greater. See 30 U.S.C. § 1232(h)(2). However, § 402(h)(3)(A) limits any such transfer to the amount the Combined Fund spends on unassigned beneficiaries for that plan year. See 30 U.S.C. § 1232(h)(3)(A). Finally, § 402(h)(1) provides that transfers may be made only in plan years 1996 and later. See 30 U.S.C. § 1232(h)(1). The parties agree that Congress included this limitation because it intended that the 1950 Fund would be applied to benefit expenditures incurred before plan year 1996, and that the

8

AML Fund would be used to defray benefit expenditures incurred thereafter.[1] Section 402(h)(4) provides a mechanism for dealing with errors in the amount of transfer in any given year, and states that:

> If, for any fiscal year, the amount transferred is more or less than the amount required to be transferred, the Secretary shall appropriately adjust the amount transferred for the next year.

30 U.S.C. § 1232(h)(4). As discussed above, the Trustees responded to Eastern by refunding the premiums paid by the Eastern companies, retroactively recalculating premiums for the remaining operators based on an increased number of unassigned beneficiaries, and reapplying past transfers from the 1950 Fund and the AML Fund to those premiums. Specifically, the Trustees used the 1950 Fund to cover the increase in unassigned beneficiary premiums in plan years 1993-95, leaving less available for death benefit premiums in later plan years. They then applied to the Secretary of the Interior under § 402(h)(4) for compensation for increased unassigned beneficiary expenses in plan years 1996-1998, which the AML Fund paid. The Trustees did not seek payment from the AML Fund for increased unassigned beneficiary expenditures in plan years 1993-1995 because of § 402(h)(1). Nor did they seek compensation from the AML Fund for the increased death benefit costs

---

[1] There is a limited exception to this scheme in that 1950 Fund monies not used in plan years 1993-95 may be set aside and applied to death benefit premiums in future plan years. That was done here, and the undoing of this carry-forward, made in response to Eastern, is one of the primary objects of the Operators' complaint.

resulting in the later plan years from their reapplication of the 1950 Fund monies, because of § 402(h)(3)(A)'s provision that AML Funds are available only for expenditures on unassigned beneficiaries. See 30 U.S.C. § 1232(h)(3)(A).

The Operators argue that it was unlawful for the Trustees to retroactively recalculate premiums and reapply past fund transfers. Instead, they argue, the Trustees should have treated the entire Eastern refund as a 1999 shortfall in the unassigned beneficiaries account of the Combined Fund. They base their argument on § 9704(e)(3) of the Coal Act, which provides, under a heading labeled "Shortfalls and surpluses":

> if, for any plan year, there is a shortfall or surplus in any premium account, the premium for the following plan year for each assigned operator shall be proportionately reduced or increased, whichever is applicable, by the amount of such shortfall or surplus.

26 U.S.C. § 9704(e)(3)(A). The Operators want the entire Eastern refund assessed against them as unassigned beneficiary premiums because they want the Trustees to apply to the AML Fund, pursuant to § 402(h)(4), for a reimbursement of the total refund amount, and not merely a portion of it. In particular, they want to avoid any retroactive recalculation of premiums so that none of the Eastern refund is assessed against them as death benefit premiums, which the AML monies cannot be used to compensate. Accordingly, the Operators argue that the Coal Act does not permit the

10

retroactive reassessment of premiums and reapplication of fund transfers that the Trustees undertook here.

We disagree. The Coal Act explicitly contemplates that certain changes in assignments will be made from time to time over the history of the Combined Fund, and requires that premiums be recalculated retroactively to plan year 1993 to reflect such changes. See 26 U.S.C. §§ 9704(f), 9706(f). Sections 9706(f)(1) and (2) provide that an operator receiving notice of an assignment may request a review of the assignment by the SSA Commissioner, which the Commissioner must grant if there is *prima facie* evidence of an error in assignment. In cases of error, § 9706(f)(3)(A)(i) directs the Trustees to adjust or repay premiums paid based on the incorrect assignment. Section 9704(f)(2) then provides that:

> In the case of any plan year beginning on or after October 1, 1994, the applicable percentage [i.e., the amount of total benefit costs an operator must pay] for any assigned operator *shall be redetermined ...* by making the following changes to the assignments *as of October 1993 ... .* Such assignments shall be modified to reflect any changes during the period beginning October 1, 1993, and ending on the last day of the preceding plan year pursuant to the appeals process under section 9706(f).

26 U.S.C. § 9704(f)(2)(emphasis added). Thus, in any given plan year, a finding by the SSA that an assignment was made in error requires that all assignments be refigured retroactively from 1993, the original plan year, forward. Likewise, §

11

9704(f)(2)(B) requires that a similar recalculation be made when an operator goes out of business and its assigned beneficiaries must be redesignated as unassigned. In this manner, although §§ 9704(f) and 9706(f) do not specifically address situations where a judicial decision causes the SSA to reassign beneficiaries, they clearly suggest a preferred method under the Act for dealing with changes in assignments: repay any premiums improperly paid as a result of the incorrect assignment, and recalculate the premiums each remaining operator owes by assuming correct assignments from the time of the first plan year, 1993, forward.

Moreover, there is precedent for applying the § 9704(f) method to changes in assignment status other than those explicitly dealt with in the statute (i.e., an operator's successful challenge to an assignment or an operator going out of business). In 1996 the SSA, as the result of a lengthy independent investigation, assigned thousands of previously unassigned beneficiaries to particular operators. In response to this reclassification of beneficiaries, the Trustees retroactively recalculated premiums from 1993 forward. As with the 1998 removal of companies affected by Eastern, this change led the Trustees to reapply the payments from the 1950 Fund and the AML Funds, and ultimately led to a $46 million reduction in the unassigned beneficiary and death benefit premiums that the Operators were required to pay.

12

The Operators do not contend that the Trustees' 1996 retroactive reassessment of premiums was in any way improper or should be reversed. Indeed, they benefitted substantially from it. Nevertheless they challenge its use here, and this reveals a core problem with their argument: they cannot explain why retroactive reassessment was proper in 1996 and not now. Moreover, they cannot point to any instance in the history of the Act where a refund paid due to a change in assignment was treated as a shortfall in the unassigned beneficiary account for that year.

Finally, there are fundamental problems with the approach the Operators advocate here. As noted above, SMCRA § 402(h)(3)(A) provides clearly that reimbursements from the AML Fund may be had only for amounts spent on unassigned beneficiary benefits. See 30 U.S.C. § 1232(h)(3)(A). But the monies refunded to the Eastern companies included amounts spent on death benefits. Thus, to allow the entire Eastern refund to be treated as a shortfall in the unassigned beneficiaries account would force the AML Fund to compensate expenditures it is not meant to cover.

A second problem is that, pursuant to SMCRA § 402(h)(1), the AML Fund cannot be used to compensate expenditures incurred in plan years 1993-1995. The Trustees recognized this and sought supplemental payments from the AML Fund only for amounts spent in plan years 1996-1998. In contrast, the Operators want

reimbursement from the AML Fund for the entire amount of the Eastern refund, which includes amounts spent in plan years 1993-95. Thus, construing the Eastern refund as a "shortfall" pursuant to § 9704(e), and allowing the AML Fund to reimburse the entire payment would appear to conflict with SMCRA § 402(h)(3) and Congress' two-part 1950 Fund/AML Fund financing scheme.

In sum, we find that although the Coal Act does not specifically address changes in assignment resulting from judicial decisions, there is no meaningful basis for treating such corrections differently from other administrative changes in assignment provided for in the Act. Thus the retroactive reassessment of premiums conducted by the Trustees was consistent with both the language of the Coal Act and with their own precedent in applying it. In contrast, the alternative, "shortfall" approach advocated by the Operators, which has never been used in connection with changes in assignment, is fundamentally at odds with the SMCRA. Accordingly, we conclude that the Trustees' retroactive reassessment of premiums in this case was proper, and that the district court therefore properly denied the Operators' motion for summary judgment and granted summary judgment in favor of the Trustees.

AFFIRMED.